J-A17045-15

2016 PA Super 126

| ROSALIND W. SUTCH, AS EXECUTRIX OF THE ESTATE OF ROSALIND WILSON, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| ROXBOROUGH MEMORIAL HOSPITAL, SOLIS HEALTHCARE, LP, ANDORRA RADIOLOGY ASSOC., TENET HEALTHSYSTEM ROXBOROUGH, LLC, TENET, INC., TENET GROUP, LLC, ROXBOROUGH EMERGENCY PHYSICIAN ASSOCIATES, LLC, BARBARA GOLDMAN ROBINS, M.D., ROBERT DOMANSKI, M.D., MICHAEL DEANGELIS, M.D., ERIN O'MALLEY, M.D., JEFFREY GELLER, M.D., AND MELANIO AGUIRRE, M.D. | |
| APPEAL OF: NANCY RAYNOR, ESQUIRE AND RAYNOR & ASSOCIATES, P.C. | No. 3494 EDA 2014 |

Appeal from the Order Dated November 4, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 0907-0901

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

OPINION BY GANTMAN, P.J.: **FILED JUNE 15, 2016**

Appellants, Nancy Raynor, Esquire and Raynor & Associates, P.C., (collectively "Ms. Raynor") appeal from the order entered in the Philadelphia County Court of Common Pleas, which found Ms. Raynor in civil contempt and imposed monetary sanctions in the amount of $946,197.16. We reverse the contempt order and vacate all judgment on the sanctions imposed.

The relevant facts and procedural history of this case are as follows. Around noon, on May 3, 2007, sixty-eight year-old Rosalind Wilson came to the emergency room at Roxborough Memorial Hospital with complaints of chest pain, shortness of breath on exertion, cough, profuse sweating, nausea, and frontal headache. Her medical history included osteoporosis, vascular disease, hypothyroidism, and hypertension. The immediate treatment plan was to rule out a heart attack. Around 4:00 p.m., Ms. Wilson also underwent a chest x-ray and later lung scans. Ms. Wilson was admitted to the hospital as an inpatient for observation. Although the tests ruled out a cardiac event, the lung studies revealed in relevant part a node in her left lung, with a recommendation for a computed tomography (CT) scan of the thorax for further evaluation. The CT scan was not performed. Ms. Wilson was discharged from the hospital the next day. No one informed Ms. Wilson of her lung node. Ms. Wilson experienced a change in mental status. In January 2009, Ms. Wilson underwent a chest x-ray at Jeanes Hospital. The x-ray revealed a large mass in her left lung. Further testing revealed metastatic brain disease. Ms. Wilson was diagnosed with Stage IV, non-small cell lung cancer with metastases.

On July 9, 2009, Ms. Wilson commenced a malpractice action against numerous medical defendants for negligent medical care and treatment that deviated from the accepted standards of care, increased her risk of harm, directly and proximately contributed to her suffering, and caused

enumerated damages. Ms. Wilson died on July 21, 2009. After her death, her daughter Rosalind Sutch, Executrix of the Estate of Rosalind Wilson, was substituted as plaintiff ("Plaintiff"). Ms. Raynor served as defense counsel on behalf of two of the defendants, Dr. Jeffrey Geller and Roxborough Emergency Physician Associates, LLC ("REPA"). Pleadings and discovery were followed by an amended complaint filed in January 2011.

The parties filed various motions *in limine* ("MIL") in 2011. On November 21, 2011, Plaintiff filed a motion to preclude at trial any reference to decedent's smoking history, primarily on the grounds of unfair prejudice, confusion of the issues, and danger of misleading the jury. By order dated December 5, 2011, and docketed December 6, 2011, the trial court entered a pretrial order that granted Plaintiff's MIL, in part, to preclude evidence, testimony and/or argument by the defendants regarding decedent's smoking history as irrelevant and unfairly prejudicial on the issue of liability. The court determined, however, that decedent's smoking history was relevant on the issue of damages. The court ordered the trial bifurcated into two phases with the same jury; if the jury found liability then decedent's smoking history would be admissible in the second phase, to follow immediately, in which damages would be assessed. If Plaintiff chose to withdraw the motion, the trial would not be bifurcated; and decedent's smoking history would be admissible with a cautionary instruction on its limited relevance.

Due to subsequent changes in the witness list, Plaintiff's counsel

renewed their pre-trial motion to preclude evidence at trial of decedent's smoking history and asked the trial court to grant the motion in its entirety, not just in part, because now there was no defense expert testimony supporting any issue for which smoking was relevant, even for life expectancy. (*See* N.T. MIL, 5/16/12, at 8; R.R. at 311a.) The trial court (another jurist) entered a new order that precluded defendants from "presenting any evidence, testimony, and/or argument regarding decedent's smoking history" either before or after her cancer diagnosis. (*See* Trial Court Order, dated May 16, 2012, filed May 21, 2012, at 1; R.R. at 372a.) This order was entered by agreement of all parties and superseded the earlier December 2011 order on the admission/preclusion of decedent's smoking history. The first jury trial began on May 21, 2012.

When the defense case was about to begin, on May 30, 2012, Plaintiff's counsel asked the court to enter an order directing defense counsel to speak with their defense witnesses about the smoking preclusion immediately before those witnesses took the stand. That exchange was as follows:

> [Plaintiff's Counsel] MR. MESSA: I just wanted to make sure we have, you know, we're clear on the record that the defendants' counsel each speak to their expert witnesses before they get on the stand and make it clear that they're not to raise that issue, blurt it out, volunteer it, *et cetera*, and the defendants as well.
>
> [COURT]: Okay. Well, I don't have a response. They know the rules. So I assume—did

- 4 -

you talk with them? Maybe you didn't bring that up this morning.

[Plaintiff's Counsel] MR. MESSA: No, Your Honor.

[COURT]: All right. Well the defendants are on notice of that request which is part of what we're doing, so…

(N.T. Trial #1, 5/30/12, A.M. Session, at 5-6; R.R. at 732a-733a). Following this exchange, the court issued no order or directive specifically requiring defense counsel to speak to their expert witnesses or the defendants about the smoking ban or warn them immediately before each expert witness testified.

During the defense case on May 31, 2012, Ms. Raynor called John J. Kelly, D.O. as her emergency medicine expert to testify. About twenty transcript pages of *voir dire* questions concerning Dr. Kelly's qualifications followed smoothly, and he was accepted as an expert on emergency room medicine and practice. After *voir dire* concluded, the court said:

COURT: All right. I think it's a little hot. We're going to turn the air conditioners on and take a break, and then we'll come back with the direct examination. I think that's the best way to do this.

**Doctor, during the break, you may relax, but don't discuss your testimony during the break.**

DR. KELLY: Thank you, Your Honor.

COURT: All right. The jury is excused, about 10 minutes or so, 10 or 15 minutes. Air conditioners can go on.

(N.T. Trial #1, 5/31/12 P.M. Session, at 83; R.R. at 933a) (emphasis

- 5 -

added). After the break, Ms. Raynor began her direct examination of Dr. Kelly. Dr. Kelly explained to the jury generally how emergency rooms work as a practical matter in real time, regarding patients who are treated and then released versus patients who are preliminarily treated in the emergency room and then admitted to the hospital for further medical care and management, including communications among the various health care providers about patient case history and test results under either scenario. (*Id.* at 84-103; R.R. at 933a-938a). For purposes of relevant, proper context, we quote from the trial transcript as follows:

> MS. RAYNOR: Can you tell the jury, give the jury some idea of what Dr. Geller's thought process is as gleaned from the records when this patient came in with the complaints that she had. Can you tell what ·Dr. Geller was evaluating her for?
>
> DR. KELLY: I read the ER record. And from the emergency department record of Dr. Geller, the patient came in with chest pain. It seemed to be right-sided. There was some associated shortness of breath and sweating with it.
>
> He did the usual thing that an emergency physician would do: go to the bedside, get the vital signs, do a proper physical exam and a history to find out exactly how this happened, what did it feel like, to be able to process exactly what it could be.
>
> MS. RAYNOR: And are those all appropriate things to do?
>
> DR. KELLY: Yes.
>
> MS. RAYNOR: Okay.
>
> DR. KELLY: And then, you know, EKG, chest

x-ray, some lab tests, cardiac enzymes, and then offer treatment, too. Offer nitroglycerin, morphine, things like that, to be able to see if this would help the patient.

MS. RAYNOR: And were all of those things that you just specified appropriate things to do; in other words, the EKG, the cardiac—

DR. KELLY: Yes.

MS. RAYNOR: —enzymes, and so forth?

DR. KELLY: Yes.

MS. RAYNOR: Okay. So if Dr. Geller was thinking that she had a cardiac issue, those are the things that would be appropriate to do?

DR. KELLY: Yes.

MS. RAYNOR: Okay. Now, you've seen also that a portable chest x-ray was done?

DR. KELLY: Yes.

MS. RAYNOR: Was that an appropriate thing to do?

DR. KELLY: Yes. A chest x-ray is an essential part of helping to add some insight into what could be causing a patient's chest pain.

MS. RAYNOR: Did you see any indication in Dr. Geller's records that he was thinking this patient had a pulmonary embolism or PE?

DR. KELLY: I saw no evidence of that in the chart, no.

MS. RAYNOR: Okay. And what type of evidence would you look for if you were looking for that?

DR. KELLY: Well, I mean, patients who have a blood clot in their lungs are usually in a lot of distress.

They have pain. They're having trouble breathing. Their oxygen level is low. Sometimes they're blue.

And then they also have risk factors, like they might have a blood clot in their leg or a tenderness in their calf, because what happens is the blood clot begins in the calf and then it actually migrates up the vein and then up into the great veins and up into the lung. So we usually—you know, we usually have scores to ask about a person's risk factors for blood clots.

MS. RAYNOR: Aside from what you saw in the records which you've just described, did you find anything in Dr. Geller's deposition transcript that educated you as to what his thought process was?

DR. KELLY: From the patient's ER record and from deposition testimony, it appeared as if the patient had some sort of chest pain that was unclear as to exactly what the cause was.

There was nothing in the ER that he found that pointed towards anything.

So—and sometimes—most chest-pain cases happen that way, where you check everything and you don't find a heart attack or a blood clot or anything; but you admit the patient just to play it safe so that they can have cardiac enzymes drawn over 24 hours to make sure this is not a silent heart attack or something like that.

MS. RAYNOR: Did she have any cardiac risk factors?

DR. KELLY: **The patient was a smoker.** The patient was hypertensive. So, yes, I mean, those are big risk factors. And the patient had vascular disease, too.

So, I mean, this is somebody who is a high risk for a problem with the heart. And I think that it was a safe move to admit the patient to a monitored bed, cardiac-monitored bed, to make sure that that gets sorted out over 24 hours, yes.

MS. RAYNOR: Did you find anything in the deposition testimony that led you to believe that Dr. Geller was considering she had a pulmonary embolism versus a cardiac event?

DR. KELLY: No. I mean, the only thing I saw in the deposition testimony of the emergency physician was that when he called the doctor who accepted the case, Dr. Aguirre, that, according to the deposition testimony, Dr. Aguirre, the accepting attending, said, "Hey, could you please do a lung scan just so that we can be sure that there's no blood clot." And so he did that favor. He wrote the order as a favor to say, "Yeah, okay, I'll do it for you."

But I think that his—his pretest probability—in other words, if he were to calculate what the risk was that this person had a blood clot, from the record and from the deposition testimony, the pretest probability was near zero.

MS. RAYNOR: Now, as an ED physician, if he wanted to—if he was considering a pulmonary embolism for this patient, did he have to do a VQ scan before initiating treatment?

DR. KELLY: If I think the patient has a major blood clot in their lung, then I would probably order blood thinner right then and there, because you have to thin the blood so that there [are] no more clots that would get trapped in the lung.

MS. RAYNOR: So he could have done that without the benefit of a VQ scan?

DR. KELLY: Could have done that; correct.

MS. RAYNOR: And did you see any evidence that Dr. Geller did order heparin or any other blood thinners?

DR. KELLY: No, he did not.

MS. RAYNOR: Based on what you've told us,

that she had various cardiac–

[Plaintiff's Counsel] MR. D'ANNUNZIO: Objection, Your Honor. May we see you at sidebar?

(*Id.* at 103-108; R.R. at 938a-939a) (emphasis added). The sidebar discussion was off the record. Afterwards, the court dismissed the jury for a break, and the jury left the courtroom. Then on the record Plaintiff's counsel registered a hearsay objection to Dr. Kelly's testimony regarding a document containing the American College of Emergency Physicians ("ACEP") guidelines for physician experts in emergency medicine. Plaintiff's second objection involved Dr. Kelly's testimony on decedent's smoking as a cardiac risk factor. The following exchange occurred:

> [Plaintiff's Counsel] MR. MESSA: The other issue is a more significant one.
>
> COURT: Well, obviously, but I want to make sure everyone puts everything they want on the record. So we can talk about the other issue.
>
> [Plaintiff's Counsel] MR. D'ANNUNZIO: The other issue, Your Honor–
>
> COURT: Well, I was going to ask the witness a couple questions.
>
> [Plaintiff's Counsel] MR. D'ANNUNZIO: Right. Was he prepped about the order that the [c]ourt had made? I mean, I would ask–
>
> COURT: Well, you may stand or be seated, and then you can talk after I get done. How's that?
>
> [Plaintiff's Counsel] MR. D'ANNUNZIO: Right. That's all right.

COURT: Doctor, just a couple of questions I have.

DR. KELLY: Sure.

COURT: We had a lot of concerns in this case, and for legal reasons and other reasons I made specific orders that they call like Motions *in Limine*, pretrial orders. And one of the orders was that we don't mention anything about tobacco or smoking or that the decedent was a smoker, *et cetera*.

In your answer to a question elicited by counsel, Ms. Raynor, you mentioned the word, "She was a smoker." I wrote it in my notes, but I didn't say anything. And there was no loud objection. But when we went sidebar, we didn't want to make it an issue in front of the jury when it came out.

My real question to you is, we asked counsel to instruct every witness not to make mention of this.

Were you advised of such orders or—

DR. KELLY: Well, I mean, I—

COURT: Did you have a discussion with Ms. Raynor about this issue?

DR. KELLY: I don't remember any discussion about that at all.

But, you know, this was in a different context. This was in a context of cardiac risk factors.

COURT: Yes. That may be—

DR. KELLY: And—

COURT: —your explanation. But my question more directly is: Did counsel advise you about

tobacco, smoking or not smoking or bringing up the idea of the patient being a smoker?

DR. KELLY: I can't remember.

COURT: You can't remember?

DR. KELLY: No.

COURT: Did you have a discussion today with her at all?

DR. KELLY: I did have some brief discussions with Ms. Raynor today, but not regarding smoking, no.

COURT: Okay.

DR. KELLY: No. And, I mean, honestly, Your Honor, it's a very innocent comment for me because of the context. The context was, you know: Did she have cardiac risk factors?

COURT: Well, we're not saying that you intended anything other than what's innocent. But in a legal proceeding, there are certain things that are admissible and certain things that are not for various reasons. One is prejudicial versus probative of the issues at trial.

And that's one of the issues that's sort of not to be raised.

So, number one, under no circumstances—and I realize, you know, you assess a patient for certain things—

DR. KELLY: Sure.

COURT: —respiratory and whatever.

DR. KELLY: Sure.

COURT: But those issues are not to be

brought up or discussed. You're going to testify further today possibly—

DR. KELLY: Okay.

COURT: —and I don't want that mentioned.

DR. KELLY: Okay.

COURT: There won't be a question. **Ms. Raynor didn't ask you a question to directly elicit it, I don't think.** But I'll let the record stand the way it is, and maybe we can talk with counsel later about her side of the story.

MS. RAYNOR: We can certainly do that, Your Honor. I know that we did talk about referring to social habits. I mean, and I said that the judge—you were redacting certain records and certain things, including—my recollection is that we talked about it when we prepped a couple of days ago. Granted, I threw a lot of information at the doctor. We were prepping about a lot of things.

But I said that, you know, the only way we can talk about these cardiac risk factors or social habits is by using the word "social habits," that smoking's out of the case.

I thought I had made myself clear. I certainly would never violate a [c]ourt order or instruct a witness to do so.

COURT: Do you have anything to say?

MS. RAYNOR: We looked at—if I could just say, we looked at records with redactions, so clearly there's two sets of records. There's one that has smoking in it and one that doesn't. And—

[Plaintiff's Counsel] MR. D'ANNUNZIO: Your Honor, we have really grave concerns about what just happened. We were worried that somebody would use this perhaps as a tactic or inadvertently to get as far into our case where we

were all in and then put us in a position of a mistrial.

And Your Honor was—we brought that to your attention specifically, and Your Honor directed defense counsel to have specific instructions with their experts that this word was not to be mentioned.[1]

The rulings went not just to the confusion on the liability issue; but there was no basis for that to come into the case and that it would be prejudicial, which was the basis for our Motions *in Limine*.

We noticed a number of jurors pick up their pads and make a note when that word was mentioned today, and my tech witnessed it.[2]

So this is really serious what's happened here today, and Ms. Raynor is directly responsible. She's evidenced other conduct for which judges in this courthouse in this case have sanctioned her—held that she engaged in sanctionable conduct.[3]

We're in a dilemma now, which I think is a tentative—where we were intentionally put in that dilemma.[4]

MS. RAYNOR:                I think that—

[Plaintiff's Counsel] MR. D'ANNUNZIO: I ask that we have a chance to discuss it, reflect on it this evening, discuss it with our clients. At a minimum we're going to ask to be

---

[1] In fact, there was no specific direction to defense counsel to instruct their witnesses.

[2] This statement was not confirmed or verified.

[3] This statement was wholly gratuitous, without confirmation or verification at that time.

[4] This statement on intent is unfounded and purely the opinion of Plaintiff's counsel.

- 14 -

able to voir dire the jury on the record about any impact it had on their decision and hold Ms. Raynor and her client and the expert liable for it for the contempt of court.

MS. RAYNOR:                    I think that's a fairly serious thing to say.  Dr. Kelly and I have had a number of discussions.  And I certainly did advise that we had this issue in the case, that we're not to refer to smoking.  And I think to blame me for it and say that I intentionally did this is totally without basis.

Your Honor could see I was shocked when it came out because I immediately looked at you, and I was waiting for counsel to get up and say something.  But I kept going because no one said anything.  And I figured gloss over it and keep moving.

So I certainly did not−in fact, when I talked about cardiac risk factors, Your Honor, I wasn't even going towards the smoking.  Where I was going was the PVD and the other carotid issues.

COURT:                    Well, I'm more concerned about the fact that each counsel should have and was responsible to at least bring up directly before each of their witnesses takes the stand to mention that this particular aspect of the case, regarding tobacco and smoking, should not be mentioned in their answers.[5]

It certainly was an order of the [c]ourt, and we spent so much time going over this.  It's just not reasonable that you don't take that extra minute to do that.  Now, I'm not −

MS. RAYNOR:                    I believe, Your Honor−

COURT:                    I'm not talking about intentional.  I don't know what's intentional, what isn't.

_____

[5] The court's statement about the timing of warnings is inaccurate, in terms of what counsel was obligated to do versus what the court hoped counsel would do.

- 15 -

It's very hard sometimes to get that far into it. But how it affects one side or the other is a big problem, and I don't always know the answer.

I thought I had a solution in a case one time. And this is so funny, because I thought I had a great solution. I had the same problem with cocaine. The word wasn't supposed to be mentioned. It didn't have anything to do with the case, and it came out in the case.

So plaintiff's counsel asked me for a mistrial, and I had a nice conversation with everybody. And I tried to work it out and go through the case, and, I don't know. Whatever I did, I got reversed. I don't think the appellate court was—

MR. McCANN: I don't know about that, Judge.

COURT: I don't think the appellate court was right, but I respect their decision accordingly. But I don't think there's winning and losing in these things. We want a fair trial for both sides. So I do what I think is right.

As far as sanctions, that's something I have to consider.

MS. RAYNOR: And, Judge, I know that I discussed it just before Dr. Harris went on, and certainly he was aware of it because he goes, "I'm not supposed to say anything," and I said, "Right." So I'm sure I would have covered it, and I never—I'm sure I covered it.

(*Id.* at 111-120; R.R. at 940a-942a) (emphasis added). The court resumed the trial, and Dr. Kelly continued his direct testimony, he was cross-examined, and his testimony concluded.

The next morning, June 1, 2012, the court held an *in camera* conference to obtain counsels' thoughts on how to advance the case. Plaintiff's counsel proceeded to excoriate Ms. Raynor, claiming her question

to Dr. Kelly about "cardiac risk factors" was at least reckless, if not intentional, as it posed an open-ended question. Plaintiff's counsel took the position that the statements of Dr. Kelly and Ms. Raynor "directly conflicted" so Ms. Raynor "lied to the [c]ourt." (N.T. Trial #1, 6/1/12 A.M. Session, at 14; R.R. at 998a). Following this comment, Plaintiff's counsel repeated he had heard secondhand "that a number of jurors perked up, wrote things immediately, and perhaps were whispering to each other about it."[6] (*Id.* at 16; R.R. at 998a). Counsel then asked for a mistrial. Short of a mistrial, Plaintiff's counsel suggested other sanctions such as (1) striking Dr. Kelly as a witness and telling the jury why he was stricken; (2) striking Dr. Geller's entire defense and articulating to the jury why the defense was stricken; (3) disqualifying Ms. Raynor as counsel pending further hearing on sanctions and her conduct in the case and telling the jury why she was disqualified; (4) costs and fees levied against Ms. Raynor and her client for the conduct; and (5) some curative instruction to the jury indicating what happened and how it was inappropriate, a violation of the court's order, and the jury should not consider the testimony and the evidence. (*Id.* at 17-18; R.R. at 999a). Plaintiff's counsel also requested a separate hearing on sanctions, based on the "pretty clear record of what happened yesterday and what Ms. Raynor did or didn't do and what her witness says he was or wasn't told." (*Id.* at

---

[6] This statement was not confirmed or verified.

23; R.R. at 1000a).

Ms. Raynor responded essentially that her question to Dr. Kelly about cardiac risk factors was completely in the context of decedent's emergency room treatment, and Dr. Kelly's response was totally unexpected. Ms. Raynor insisted she had covered the smoking ban extensively with each of her witnesses. She tried to explain how Dr. Kelly does not testify every day and under the stress of trial, it just came out. The court said:

> COURT: I mean he didn't say to me, "Oh, she told me that, but I didn't mean it." I—you know, I was looking for him to say, "Uh-oh, I made a mistake, Judge. That was me." That's what I was kind of looking for when I heard him and asked him that. And I don't know—
>
> MS. RAYNOR: And that's—
>
> COURT: I'll tell you the truth. I was hoping that's what he would have said versus, "No, she didn't tell me anything." Because it's the responsibility of the attorney to follow orders.
>
> And I said this before: I don't know if it's intentional because I have no reason to believe you intentionally told him to bring it up or planned it like a plot, God forbid.
>
> MS. RAYNOR: Of course not.
>
> COURT: But, you know, omission and failure to do what you're supposed to do is wrong also. I mean, I don't say any of these doctors in the case, I hope, you know, deliberately didn't notify [Ms.] Wilson about what they knew or should have known or could have known. It's negligent. I mean, it is a problem if that's what happened.

MS. RAYNOR: No. And I even know the language that I used. I said the judge isn't allowing us to talk about smoking. We have to use the word "social habits" or the judge—"we're not allowed to." "Allowed" is the word that I used. And I said, "We're not allowed to refer to it. We're not allowed to put records in. We've had to redact from the records things that indicate smoking."

Did I show him the [c]ourt order and say, "Here is what the Judge said"? No, and I wouldn't routinely do that.

But I said to him, "You are not allowed to talk about smoking." I thought that was clear. And, in fact, that's what he told me afterwards, at the end of the day. He said, "I just slipped up," I think, were his words. And I invite you to call him if you want to talk to him. And apparently—

COURT: Listen, I have no doubt we can do more of an in-depth whatever, but I'm not getting to that point.

MS. RAYNOR: And Dr. Geller actually ran into him on a street corner as they were leaving the courthouse yesterday. And Dr. Kelly made the same comments to him, which is why he wanted to—Dr. Geller has offered, he wants to tell you—

COURT: Well, if we get to that point and I choose to ask Dr. Geller, I will do that. I'm sure he would be honest about it, I hope. But I'm not at that point.
Let's move on.

MS. RAYNOR: Your Honor to be assured that it was not—first of all, it wasn't intentional. Second of all, it was not an omission. I thought that I expressed myself very clearly by using the language, "You're not allowed to use the word 'smoking.' You're not allowed to talk about it."

* * *

> Mr. Messa has made a very inflammatory allegation that I lied to this [c]ourt. I absolutely did not lie to this [c]ourt.

(*Id.* at 32-36; R.R. at 1003a-1004a). Defense counsel asked the court to rule immediately and not take Plaintiff's request for a mistrial under advisement until after the verdict, as Plaintiff's counsel requested, because that would invite mischief.

On June 4, 2012, the court resumed its conference with counsel outside the jury's presence. Plaintiff's counsel renewed their request for a mistrial on the grounds that Dr. Kelly's testimony violated the smoking preclusion order and irreparably prejudiced Plaintiff's case. Counsel also renewed their request for alternative sanctions in lieu of a mistrial. Counsel asked for additional sanctions against Ms. Raynor under the ethical rules governing candor to the court citing the record of May 31, 2012, which counsel characterized as demonstrating a clear conflict between Ms. Raynor and Dr. Kelly on whether Ms. Raynor had instructed him about the smoking ban. After a short recess, the court said:

> The court has reflected upon the arguments of counsel, the applicable cases that were submitted to the extent that they're applicable, and it's probably a difficult decision for me in many ways, you know, but I said this before. You do the best you can and you rely upon your best judgment and experience as well as what you're to be guided by in knowing what's happened in this trial and what has transpired in this trial, and all that's before the court. And I think in a sense, even though I'm guided so much by your arguments and your feelings in it, I as the trial judge believe that I am in the best position to make the final decision, and it is my job to make the final decision.

> So based upon all that's before me, I am going to deny the plaintiff's motion for a mistrial.

(N.T. Trial #1, 6/4/12 Morning Session, at 14; R.R. at 1034a). With all counsels' input, the court then reviewed a proposed curative instruction to give to the jury as trial resumed.

When the jury was brought back into the courtroom, the court issued the curative instruction as follows:

> Lung cancer can be caused by many things. This case is not about its causes. The cause of Ms. Wilson's specific type of lung cancer is not known. Further, smoking should not be considered in this case. Whatever may have caused the lung cancer has nothing to do with the issues of whether the defendants breached their standard of care and caused the harm suffered by Rosalind Wilson. It has nothing to do with the issues you are considering in this case.
>
> For that reason before I started this trial I ordered and the parties agreed that no party was allowed to discuss any potential reason for the cause of [Ms.] Wilson's lung cancer. I instructed all counsel to advise their witnesses of the [c]ourt's order before taking the stand.[7] Last Thursday afternoon Dr. Geller and REPA violated the [c]ourt's order through testimony introduced from Dr. Kelly. You are instructed to disregard that portion of Dr. Kelly's testimony because it is irrelevant and misleading.
>
> I am instructing you that you are to consider in your deliberations only: one, whether the defendants breached the standard of care by failing to advise [Ms.]. Wilson, her family, or her family physician about the nodule on her lung; two, whether any such failure increased the harm to

---

[7] The court's statement is not exactly accurate, in terms of what counsel was obligated to do versus what the court hoped counsel would do.

[Ms.] Wilson, or decreased her chance of survival; and three, the amount of damages caused by any such failure.

And I am asking you to follow these instructions as I am giving them to you, and that's your sworn duty as jurors in this case. So thank you up to now for your time and attention, and you have to hear all the evidence, however, and that's going to continue now with the next witness for the defense.

(**Id.** at 29-30; R.R. at 1049a-1050a). The trial resumed.

On June 8, 2012, the jury found in favor of Plaintiff and awarded her $190,000.00. The jury found Tenet HealthSystem Roxborough, LLC d/b/a Roxborough Memorial Hospital 50% liable and Melanio Aguirre, M.D. 50% liable for the negligent care of Plaintiff. The damages were apportioned $100,000.00 for the survival action and $90,000.00 for the wrongful death action. The jury found no liability with regard to any other defendant.[8] (Verdict Sheet, 6/8/12; R.R. at 1120a-1125a). This verdict was initially entered on the docket on June 14, 2012.

Plaintiff timely filed a motion for post-trial relief on June 18, 2012, and requested a new trial because (1) the court erred in denying Plaintiff's motion for a mistrial based on Dr. Kelly's violation of the smoking preclusion order and/or (2) the "grossly inadequate" verdict. Plaintiff further moved for "an award of sanctions jointly and severally against Dr. Geller and his counsel, Ms. Raynor and her firm, for Plaintiff's costs including attorneys'

_____

[8] The jury was not polled regarding what effect, if any, the decedent's smoking history had on the verdict.

fees incurred in preparing for and attending trial, in light of the need for a new trial caused by their introduction of evidence of smoking in violation of the [c]ourt's orders." Alternatively, Plaintiff asked the court to enter the sanctions award jointly and severally as well against Dr. Geller's expert, Dr. Kelly, for his role in the introduction of the precluded testimony. (**See** Plaintiff's Motion for Post-Trial Relief, 6/18/12, at 1-38; R.R. at 1126a-1163a.)

Ms. Raynor filed an answer in opposition to the post-trial motion on June 28, 2012. On October 22, 2012, the court granted Plaintiff's motion for a new trial but deferred ruling on the companion contempt/sanctions motion. Defendants timely filed their notices of appeal. The trial court later molded the verdict on January 8, 2013, to include delay damages for a total verdict of $205,353.56.

In its opinion, the court stated that its decision to grant Plaintiff a new trial was not based on the inadequacy of the jury verdict. Instead, the trial court insisted it had ordered the new trial "solely for reason that its Pre-Trial Order precluding the mentioning of decedent's smoking history was violated, resulting in unfair prejudice to the plaintiff and therefore failed to allow her to have a fair trial on the merits." (**See** Trial Court Opinion, filed May 28, 2013, at 4; R.R. at 1633a.) After acknowledging Plaintiff's counsels' failure to object or request a mistrial immediately upon the errant testimony, the court recognized their bid for a sidebar, in which they raised the issue of a

mistrial, as the essential contemporaneous objection and call for relief. (***Id.*** at 6; R.R. at 1635a). The trial court continued:

Upon reflection, this [c]ourt does not agree with Appellant/Defendants that the…curative instruction was enough to cure the prejudice resulting from defendant's violation of this [c]ourt's preclusion Order. This [c]ourt at the time it rendered its decision not to grant a mistrial determined that only a strongly worded instruction to the jury could cure the violation of this [c]ourt's Pre-[Trial] Order banning the mentioning of decedent's smoking history. However, as will be discussed below, this [c]ourt, after reflection and due consideration, does not believe that even a strongly worded curative instruction such as the one given to the jury in the instant matter could have cured the prejudicial effect that was created when they were told that Plaintiff's decedent was in fact a smoker. As some legal minds have proffered, a curative instruction may unfortunately sometimes serve to highlight to the jury a fact (decedent was a smoker) that the [c]ourt was attempting to eradicate from their collective memory and thought process. In addition, as will be discussed below, it is this [c]ourt's determination that in a failure to warn medical malpractice matter involving a death from lung cancer, advising the jury that decedent was a smoker, when all parties agreed prior to trial to ban decedent's smoking history, is so egregious that there can be no cure to the resulting prejudice, other than a New Trial. …

\*    \*    \*

[T]his response was to a question posed concerning cardiac risk factors not lung cancer risk factors. However, this does not change the prejudicial effect on [P]laintiff's case. The jurors now had knowledge that despite the overwhelming evidence that smoking causes cancer, [P]laintiff's decedent decided to smoke and died from lung cancer.

This [c]ourt entered an Order with the agreement of all counsel (Defendants included) that [decedent's] smoking habits were prohibited from being mentioned during the trial due to the reality that jurors may hold [decedent]

accountable to some extent for her developing her own lung cancer. As all counsel agreed, none of the defendants that remained in the case when trial commenced had any meaningful or relevant interest in advising the jury that Plaintiff was a smoker. Therefore, the fact that [decedent] was a smoker had absolutely no probative value and could serve only to severely prejudice Plaintiff's claims before the jury. As such, for Defendants to now argue that a single utterance of the word smoking was not so prejudicial so as to prevent Plaintiff from a fair trial is not meritorious. The jurors did not simply hear the word "smoking," but were told that decedent herself smoked and that it was a big risk factor, albeit in the context of cardiac issues.

\* \* \*

In the instant matter, this [c]ourt's Pre-Trial Order precluding the mentioning of decedent's smoking history was based upon its potential to seriously prejudice and undermine Plaintiff's case. Further, and just as importantly, advising the jury that [decedent] smoked had absolutely no probative value. This trial was in its eighth (8th) day when the violation occurred, this [c]ourt in addressing the mistrial issue, gave great weight to the fact that all parties, but in particular Plaintiff, had already expended a great amount of time and expense. In addition, this [c]ourt was acutely aware of the toll the trial was taking on Plaintiff's family, many of whom were at trial every day, as well as its toll on the Defendants themselves. As such, this [c]ourt, with heavy hesitation, decided to give the jury a strongly worded curative instruction.

Upon great reflection, it is this [c]ourt's determination that in the case at bar, a curative instruction would not serve to insure that Plaintiff was given a fair trial, unblemished by the prejudice that resulted from Defendant Dr. Geller's violation of this [c]ourt's Pre-Trial Order. The PA Rules of Civil Procedure require the filing of Post-Trial motions so as to help formulate any issues for possible appeal, but also to permit the trial court to reflect upon what occurred during trial, and if necessary, enter an Order that will in effect clear up any errors that occurred during trial. It is

upon this reflection that this [c]ourt entered its Order Granting [Plaintiff's] Post-trial Motion for a New Trial.

(*Id.* at 10-14; R.R. at 1639a-1643a). On November 4, 2013, this Court affirmed the trial court's decision to grant a new trial. *See Sutch v. Roxborough Memorial Hospital*, 91 A.3d 1273 (Pa.Super. 2013) (unpublished memorandum).

Subsequently, on March 11, 2014, the trial court ordered a hearing on Plaintiff's motion for contempt/sanctions, limited to issues concerning whether sanctions should be imposed. The order stated, "Any evidence with regard to the type of sanctions to be imposed, monetary or otherwise will be held under advisement pending the scheduling of a subsequent hearing if necessary." (*See* Trial Court Order, filed March 11, 2014, at 1; R.R. at 1766a.) On March 14, 2014, Ms. Raynor filed a motion to determine the nature of the sanctions sought by Plaintiff. Plaintiff's counsel responded and specified costs and fees under 42 Pa.C.S.A. § 2503(7) for dilatory, obdurate, or vexatious conduct; civil contempt; and direct criminal contempt.

The first contempt hearing began on March 27, 2014, with a review by the court of the procedural history that led to the current proceedings, followed by the introduction of all counsel, followed by the court's announcement that the contempt/sanctions hearing would be bifurcated, with the initial hearing intended to settle whether sanctions were even warranted. Plaintiff's counsel, Mr. Messa, under the auspices of "candor," first addressed the court concerning a document he had in his possession.

The paper purportedly contained a "note" Dr. Kelly had made when documenting a telephone conversation with Dr. Geller's current counsel, Judy Packett, Esquire. Plaintiff's counsel represented the note to suggest there was some collusion between the court and Plaintiff's counsel. Mr. Messa displayed his outrage over what he had interpreted to be the note's suggestion and insisted this matter should be brought to the court's attention before Dr. Kelly took the stand and was cross-examined about his note. The trial court wisely observed that it did not consider the notation relevant to the present proceedings, stating: "I don't know that that's relevant at all because in terms of it if someone's handwritten notes about whatever they feel they want to write on a piece of paper[;] that's on them." (N.T. Hearing, 3/27/12, at 15; R.R. at 1785a). The court also astutely remarked that it was a little confused by Mr. Messa's approach and did not want to set a bad tone on the hearing. (*Id.*) The court said: "I mean the question is and the issues now are did [Ms. Raynor] inform [Dr. Kelly] of the pretrial order. Was the pretrial order discussed in the preparation of his testimony, was he warned not to bring that up, *etc*. As far as any other things I'm not looking at them. I mean anybody has any issues, anyone makes any accusations, whatever, let them make it because there's nothing else in this case at all. The issue of sanctions would only come up if this court decided that there was an appropriate discussion with the witness prior to and in violation of pretrial orders which caused the mistrial in this case."

(*Id.* at 16; R.R. at 1785a).[9] The court recollected there had been efforts to settle the matter, which involved talks with Plaintiff's counsel and defense counsel, but the court noted nothing inappropriate from the standpoint of the court or Plaintiff's counsel. (*Id.* at 17; R.R. at 1786a). The court assured counsel that the court was not personally offended and could rule fairly. The court also clarified that Plaintiff's counsel was proceeding against Ms. Raynor in civil contempt for compensatory damages **and** under 42 Pa.C.S.A. § 2503(7) (counsel fees as a sanction for dilatory, vexatious, and obdurate behavior). Finally, the court announced it had no intention of taking up the matter as a criminal proceeding for criminal contempt.

Following these introductory remarks by the court and Plaintiff's counsel, Plaintiff's counsel stated they would rely **solely** on the notes of testimony from the first trial and would not be presenting any additional evidence to support their motion for contempt/sanctions, arguing that the transcripts speak for their case. Defense counsel objected to the use of Dr. Kelly's testimony as hearsay on several grounds: (1) Ms. Raynor was not a party in the trial and (2) she had no opportunity to cross-examine Dr. Kelly. Therefore, defense counsel submitted that Dr. Kelly's responses to the court's inquiries during the first trial could not be used against Ms. Raynor in the present contempt/sanctions proceeding.

---

[9] There actually was no mistrial; instead, the court granted Plaintiff's post-verdict motion for a new trial.

Plaintiff's counsel repeated their position that the transcripts from the first trial were all they had and all they needed to prove contempt against Ms. Raynor, her firm, the hospital, Dr. Geller, and Dr. Kelly. Plaintiff's counsel insisted the current hearing was just for defendants to come in and have an opportunity to present testimony:

> [Plaintiff's Counsel] MR. D'ANNUNZIO: … In terms of the record Dr. Kelly's conduct occurred in front of the court. This hearing is just for them to come in and have an opportunity to present any testimony they would like. Ms. Raynor is an officer of the court and is subject to the powers of the court. Dr. Kelly [is] a [participant], Dr. Geller is a participant[; they] are all subject to the court's inherent power to enforce its orders. It occurred in front of the court. Dr. Kelly's comments are not hearsay. They're obdurate acts. They're also when he says I was not told that's not a hearsay statement. It's a fact. …

(*Id.* at 27-37; R.R. at 1788a-1791a).[10]

Ms. Raynor's counsel argued that the transcript from the first trial was insufficient to carry Plaintiff's initial burden on contempt, because Dr. Kelly's responses to the court's impromptu inquiries at the first trial were wholly neutral and did not prove or disprove anything other than Dr. Kelly's lack of memory. In addition, defense counsel continued:

> DEFENSE COUNSEL: … Let [me] point out to the court that one of the things about this record and even if the court were to accept or admit the statement by Dr. Kelly and statements by Dr. Kelly in response to the court's questions, which is really inadmissible…because of the hearsay, what you have is a record which is conflicting

---

[10] This description is characteristically used for criminal contempt.

- 29 -

and the plaintiff [has] presented that evidence and it conflicts. That is, that Dr. Kelly says he doesn't remember being told and Nancy Raynor says in her statements that she told him. So at this point the court has no ability to find that [P]laintiff has sustained her burden with respect to these issues on either [Section] 2503 or the civil contempt.

Let me point out to the court there's a number of things. First of all, this court order, in order to find civil contempt the court has to find that in fact my client actually violated a court order. [There is ] no order of the court which says that Ms. Raynor is to specifically tell any witness anything at all. All it says or what it says is that there's no evidence that's admissible relating to smoking or that [decedent] has smoking history, I believe it used the term smoking history, the order does not compel Nancy Raynor to do anything with respect to the evidence except obviously she couldn't intentionally elicit that evidence or ask a question did [decedent] have a smoking history. As the court realize[s] the question posed by Ms. Raynor did not use the term smoking, did not use the phrase smoking history and there was no objection to the question which [she] posed during the trial. The objection came only after with respect to the response that was given. So that there is no basis on which to find [contempt]…that Ms. Raynor violated the terms of that court order and that is necessary in order for the court to proceed with a civil contempt proceeding for the plaintiff to sustain [her] burden with respect to the issue.

Ms. Raynor is not the person who mentioned smoking. So accordingly she's not the person who can be in violation of this order.

COURT: I'm not arguing with you on this point. What I'm saying is he's resting on the record. Now it's your chance to argue that point.

DEFENSE COUNSEL: I am arguing that point. I'm arguing the point before I have to put on evidence because he has to sustain his burden first.

COURT: I understand that. I'm just

- 30 -

going to read through this then maybe you won't have to put on evidence but maybe you will.

* * *

… I want to hear from Dr. Kelly if he has any other testimony to give.

(*Id.* at 39-42; R.R. at 1791a-1792a). Counsel noted to the court that Plaintiff had already rested, which the court affirmed. A brief recess ensued and then this exchange occurred:

COURT: We always try to give everybody their chance to say what they need to say. I need to look over the trial testimony and plaintiff rested and all the other motions by the defense. I did review it. I'm going to accept it as it is on the record. Nobody is changing it, that's what it is. I'm going to give the defense a chance now to present testimony or not present testimony with regards to sanctions in this case.

* * *

DEFENSE COUNSEL: I need to obtain a ruling from the court about whether Dr. Kelly's testimony is admissible.

COURT: That record is admissible.

DEFENSE COUNSEL: I'm asking specifically about the reference.

COURT: That is admissible. The whole trial transcript.

DEFENSE COUNSEL: What I need to learn from the court is my objection to Dr. Kelly's testimony.

COURT: I noted your objection. Let's go.

DEFENSE COUNSEL: Because it's absolutely hearsay.

- 31 -

We did not have an opportunity to cross-examine the testimony. My client was not a party to the action and so therefore—

COURT: You may appeal that ruling at the appropriate time and you may win on that regard or not but we're here to hear from your client or not.

DEFENSE COUNSEL: No, we're not here to hear from my client, Your Honor.

COURT: You're asked not to put on testimony or not.

DEFENSE COUNSEL: I have to finish, if I may, Your Honor. I have a motion that [P]laintiff has not sustained [her] burden, cannot sustain [her] burden with respect to either [] source of sanction as she is pursuing, [Section] 2503,[she] hasn't proven my client did anything wrong as well with respect to that. And also civil contempt. Civil contempt requires that she has violated a court order. There's no proof of that. What you have is this transcript which establishes, because of Ms. Raynor's statement found on page 117, Dr. Kelly and I have had a number of discussions and I certainly did advise that we had this issue in the case that we're not to refer to smoking. So that establishes Ms. Raynor's [compliance] with the order. This is evidence [P]laintiff presented and not otherwise.

MR. D'ANNUNZIO: Now he's asking for reconsideration.

DEFENSE COUNSEL: You're not going to talk to me.

COURT: Don't talk to him Mr. D'Annunzio, he's right. But I don't know what else to tell him. I made a ruling. Your request is denied. Your motion, whatever motions you're making, whatever request is denied. We're moving on to whatever you have.

DEFENSE COUNSEL: Can I put the grounds, the balance of the grounds for the motion on so we have a complete record[?]

COURT:                                Sure.

DEFENSE COUNSEL:        Your Honor, that the civil contempt is not appropriate because two things.  First of all, the argument of the order which we're dealing with I understand to be the order of May 16, 2012 is that—

COURT:                                I don't have the date.  I'll accept it.

*    *    *

DEFENSE COUNSEL:        I just want to make sure that this is the order that we're addressing.  The order does not include any order by the court for Ms. Raynor to take any action with respect to that order.  So that in order to have contempt she must not have followed the order or complied with the order.  Ms. Raynor is not required by this order to do anything so therefore, and she's not the person who mentioned smoking.  She did not [use] smoking in her question and she did not provide argument about smoking.  She did not use that term so for that reason [she] is not in violation of any order.

In addition she cannot be found liable for the statement I'm talking about criminal contempt for—

COURT:                                No criminal case.  We're not talking about a criminal case.

DEFENSE COUNSEL:        I understand, civil for the statement for the testimony provided by Dr. Kelly because there's no vicarious liability for civil contempt or any form of contempt.  Also there is not a basis for vicarious liability for [S]ection 2503 liability.  So the statement by the witness is not attributable, cannot be attributable to Ms. Raynor and her law firm cannot be liable for a statement by Dr. Kelly or testimony by Dr. Kelly.

In addition [P]laintiff's evidence does not establish obdurate or vexatious behavior as the court realizes that information that is— that there's no conduct by Ms. Raynor which is established by the trial transcript which would suggest that she was in any way acting in

- 33 -

some obdurate or vexatious [manner] or for purposes to vex [P]laintiff.  So for that reason, Your Honor, the 2503 section sanctions should be dismissed.

And then with respect to… civil contempt is for the purpose of compelling actual compliance of a then existing order.  …  So the civil contempt sanction request should be denied also and at this point should be dismissed because of the failure to sustain their burden.

COURT:  At this stage I'm not dismissing anything other than the criminal proceeding.  The court is not proceeding in any way [with] the criminal proceedings of contempt.  We're moving on.  You have any other testimony or evidence?

DEFENSE COUNSEL:  I do.  Does the court credit my client's statement in the record?

COURT:  The record is accepted as given.  It's in the evidence for [P]laintiff.

*    *    *

DEFENSE COUNSEL:  …what I'm asking is does the court credit that Ms. Raynor told Dr. Kelly that she had a number of discussions and advised him about that he was not to refer to smoking?

COURT:  Is that in the record?

DEFENSE COUNSEL:  Yes.

COURT:  Then that's her statement.

DEFENSE COUNSEL:  What I'm asking is whether the court credits that as a valid statement.

COURT:  It's credited.  I'm taking that into consideration.  Everything that is in the record is taken into consideration.  And now I'm here to hear any further testimony.  They rested, and from the defendant if you would like to add anything else then I'm going to try to make a very fair decision based on everything that I

> have before me. If I'm taking into consideration something that you feel I should not be doing you may want to appeal this later if it's adverse to you, the decision may not be adverse to you.

(*Id.* at 43-50; R.R. at 1792a-1794a).

Upon the court's decision to overrule defense counsel's objections based on the content of the order at issue, the inadmissibility of Dr. Kelly's May 31, 2012 limited testimony regarding the smoking ban, and the insufficiency of Plaintiff's offer of proof, testimony for the defense began. The defense initially presented testimony from Ronald Stu Moore, Dr. Geller, and Dr. Harris (by stipulation). Mr. Moore swore that Ms. Raynor had told Dr. Kelly about the smoking ban and was surprised when Dr. Kelly did not recall, which had to have been a mistake. Mr. Moore understood how Ms. Raynor did not argue that with the judge at the time. Dr. Kelly appeared completely rattled by his error. The testimony of Dr. Geller related to the same conversation they had all participated in with Dr. Kelly before his testimony on May 31, 2012. Both Mr. Moore and Dr. Geller specifically recalled Ms. Raynor reminding Dr. Kelly during the conversation that he was not to discuss decedent's smoking history during the trial testimony. Dr. Geller further testified he had "commiserated" with Dr. Kelly on the unfairness of the preclusion in the courtroom hallway before Dr. Kelly testified. Dr. Geller also stated he was aghast when he heard Dr. Kelly mention at trial that decedent was a smoker. According to Dr. Geller, Dr. Kelly appeared flustered and upset with himself over his testimonial misstep,

when he apologized to Dr. Geller and Ms. Raynor. Dr. Geller's overall impression was that Dr. Kelly mentioned smoking accidentally in the context of cardiac risk factors as if he had mentally slipped into a routine lecture to medical students. Dr. Geller made clear his treatment of decedent was primarily centered on heart issues, given her presenting complaints, which was how the issue of "cardiac risk factors" came into focus at trial.

Dr. Harris' testimony was presented to the court by stipulation of all parties. Dr. Harris confirmed that, on several occasions throughout the pretrial preparation: (1) Ms. Raynor had informed him of the existence of a court order prohibiting any reference to smoking at trial; (2) she had discussed with Dr. Harris the reason the medical records were being redacted; (3) in the days leading up to Dr. Harris' trial testimony, Ms. Raynor made it clear to him the order prohibiting any reference to smoking was a serious and important ruling in the case; and (4) on the morning he testified, Ms. Raynor once again reminded him of the court order and the fact that he could not use the word "smoking" in his testimony.

The contempt hearing resumed on March 31, 2014, with Ms. Raynor's testimony, in which she repeated her previous position to the court about the multiple pretrial conversations she had had with Dr. Kelly, which included warnings regarding the smoking preclusion. Her testimony emphasized the "interactive" quality of these discussions, by which she confirmed Dr. Kelly knew and understood the discussions. She also outlined

her usual and customary practice with regard to preparing her witnesses in medical malpractice cases. Ms. Raynor referred to other instances where Dr. Kelly demonstrated in his testimony at trial how he did not recall something she had just discussed with him, for example, the preliminary and final x-ray reports. Ms. Raynor denied she had ever told or suggested to Dr. Kelly to mention smoking or had any intention to cause a mistrial. She also gave her rationale for questioning Dr. Kelly on "cardiac risk factors." Ms. Raynor said she truly believed Dr. Kelly simply made an honest mistake; he failed to remember that she had warned him, which does not automatically mean she failed to warn him. In fact, she gave Dr. Kelly the warning against the mention of decedent's smoking history as a global, across-the-board, blanket prohibition on any use of the word "smoking."

Dr. Kelly also testified at the sanctions hearing on March 31, 2014. He stated he **did not remember** if Ms. Raynor had informed him of the smoking preclusion order. Dr. Kelly said he believed Ms. Raynor was truthful in her statement to the court that she had previously discussed the smoking ban with him. Additionally, Dr. Kelly testified he had discarded all of his notes from trial. Importantly, at this time, Dr. Kelly was also a defendant in Plaintiff's motion for sanctions.

Following the parties' submission of proposed findings of fact and conclusions of law, the court issued an order dated May 2, 2014, and filed on May 5, 2014, that imposed sanctions against only Ms. Raynor in an amount

"to be determined." The court's order is as follows:

**ORDER**

AND NOW, this [2nd] day of [May] 2014, upon consideration of Plaintiff's Motion for Post-Trial Relief in the nature of Sanctions against non-parties John J. Kelly, D.O., Nancy Raynor, Esquire, and Raynor & Associates, LLC, and against Defendants Jeffrey Geller, M.D. and Roxborough Emergency Physician Associates, LLC, and after hearings on March 27, 2014 and March 31, 2014 and upon consideration of the submissions by the parties and non-party representatives of Findings of Fact and Conclusions of Law, it is hereby ORDERED and DECREED that this [c]ourt makes the following findings :

1)      That this [c]ourt entered a Pre-Trial Order dated May 16, 2012 which precluded the Defendants from presenting any evidence, testimony, and/or argument regarding decedent's smoking history.

2)      That this [c]ourt, during trial and prior to witnesses taking the stand, admonished all Counsel to remind their witnesses of this [c]ourt's Order, precluding any reference to the decedent's smoking history.

3)      That during trial, Defendant, Jeffrey Geller, M.D. called John J. Kelly, D.O. as an expert witness to testify on his behalf.

4)      That Dr. Kelly, in response to a question posited to him by Defendant Geller's attorney, Nancy Raynor, Esquire, testified in front of the jury that decedent had been a smoker.

5)      That Dr. Kelly testified credibly before this [c]ourt during both his colloquy with this [c]ourt immediately following his testimony in the underlying case and during the sanctions hearing of March 31, 2014, regarding the content of conversations that took place between him and Nancy Raynor, Esquire.

6)      That Nancy Raynor, Esquire violated this [c]ourt's

- 38 -

Order in that she failed to so advise Dr. Kelly of this [c]ourt's preclusion Order and/or failed to follow this [c]ourt's clear instructions by failing to remind Dr. Kelly just prior to his taking the stand as to this [c]ourt's Order precluding any reference to decedent's smoking history.

7)   That Nancy Raynor, Esquire violated this [c]ourt's Order precluding the presentation of any evidence of decedent's smoking history.

8)   That as a result of Ms. Raynor's violation of this [c]ourt's preclusion Order, this [c]ourt entered an Order dated October 19, 2012, granting [P]laintiff's Post-Trial Motion for a New Trial.

9)   That Plaintiff and her counsel were caused to expend time and money preparing and trying this case which resulted in the granting of a mistrial all to their detriment in that they will have to now retry this case.

10)   That due to Ms. Raynor's violation of this [c]ourt's preclusion Order, Plaintiff and her [c]ounsel have suffered monetary losses in the nature of counsel fees, costs and expenses.

It is therefore ORDERED and DECREED that Sanctions shall be imposed upon Nancy Raynor, Esquire, only, in an amount to be determined by this [c]ourt. Nancy Raynor, Esquire is given twenty (20) days leave of court to file a response challenging the amounts set forth in the Plaintiff's brief and supporting documentation regarding Plaintiff's claim for attorney fees, costs and expenses.

(Contempt/Sanctions Order, filed May 5, 2014, at 1-2; R.R. at 2039a-2040a). In Plaintiff's supporting brief, Plaintiff had requested payment for all of Plaintiff's attorneys' hourly fees associated with the first trial, totaling $1,349,063.67 in proposed sanctions. On May 27, 2014, Ms. Raynor filed a brief disputing the amount of proposed sanctions and requested an

evidentiary hearing.

Without any hearing on the reasonableness of the sanctions, the court awarded Plaintiff's counsel a total of $946,195.16 in attorneys' fees and expenses on November 4, 2014. The court awarded $615,349.50 to Plaintiff's lawyers from Klehr Harrison and $160,612.50 to her lawyers from Messa and Associates. The court also awarded $170,235.16 to Plaintiff herself for "actual expenses." The court did not explain in its November 4, 2014 order how these fees/expenses were appropriate or correct. Ms. Raynor timely appealed the November 4, 2014 order for contempt and sanctions.

Meanwhile, on November 6, 2014, the second trial in Plaintiff's medical malpractice case concluded with the entry of a new jury verdict in favor of Plaintiff; this time the verdict was against defendants Roxborough Memorial Hospital, Jeffrey Geller, M.D., and Melanio Aguirre, M.D. The second verdict was in the amount of $1,975,713.00. Significantly, a different jurist presided over the second trial, and the parties were permitted to refer to decedent's smoking history during the damages portion of the case.

On November 26, 2014, the court ordered Ms. Raynor to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Ms. Raynor timely complied on December 17, 2014. On January 5, 2015, Ms. Raynor filed a motion to stay Plaintiff's execution on the sanctions pending appeal. Plaintiff filed a *praecipe* for entry of judgment on January 8,

2015, and the court entered judgment against Ms. Raynor on that date. On January 15, 2015, the trial court granted Ms. Raynor a temporary stay of execution pending a hearing scheduled for February 19, 2015. This order, however, did not dissolve the attachments entered against Ms. Raynor's assets. Ms. Raynor filed an emergency motion to dissolve the attachments on January 22, 2015, stating the attachments essentially froze all of her assets, which prevented her from paying the firm's operating expenses or her personal expenses. The trial court denied Ms. Raynor's motion to dissolve the attachments in an order issued on January 23, 2015. On February 3, 2015, the court filed its opinion pursuant to Pa.R.A.P. 1925(a). In its opinion, the court justified its rationale for the sanctions award in the form of counsel fees associated with the first trial based on (a) the complexity of the medical malpractice issue; (b) the "industry standard" rates for the fourteen attorneys and two paralegals claimed to have worked on the case; and (c) the necessity for extensive post-trial work. The court gave no explanation for the "actual losses" it awarded directly to Plaintiff except to state it was "a very emotional case for Plaintiff's family." (**See** Trial Court Opinion, filed February 3, 2015, at 24.)

On February 10, 2015, Ms. Raynor filed an emergency application for *supersedeas* with this Court to vacate the trial court's orders and remand for a hearing on newly discovered evidence from a critical fact witness. Plaintiff answered on February 12, 2015, and Ms. Raynor filed a reply on February

13, 2015. On February 18, 2015, this Court granted Ms. Raynor's request to remand for a hearing on her proposed newly discovered evidence in the nature of testimony by a new witness, Joseph Chapman. This Court also stayed all existing execution and garnishment actions stemming from the trial court's sanctions. This Court stayed all other proceedings in the trial court, pending that court's decision following the hearing on Ms. Raynor's proposed newly discovered evidence.

On March 4 and March 10, 2015, the trial court held hearings on Ms. Raynor's proposed newly discovered evidence. At the hearings, Ms. Raynor presented the testimony of Mr. Chapman, a trial technician for the defense during the 2012 medical malpractice trial. Mr. Chapman testified he was present in the hallway during the lunch break on the day Dr. Kelly testified and heard Ms. Raynor tell Dr. Kelly that smoking was out of the case. Mr. Chapman also testified that he approached Ms. Raynor at the end of the day, on May 31, 2012, after Dr. Kelly's testimony, and told her he would be willing to tell the court he had heard Ms. Raynor remind Dr. Kelly not to mention smoking. Mr. Chapman, however, believed Ms. Raynor did not hear him. More recently, after he had read about her case in the newspaper, Mr. Chapman contacted Ms. Raynor on January 28, 2015, to inform her again that he had heard her tell Dr. Kelly before his testimony on May 31, 2012, that any mention of smoking was precluded at the 2012 trial.

On April 24, 2015, the court issued an order and opinion, denying Ms.

Raynor's application for reconsideration of the sanctions order. The court stated it found Mr. Chapman's testimony incredible and suspicious, due to the timing of his disclosure and what the court believed were inconsistencies in Mr. Chapman's testimony. The court concluded the testimony did not qualify as "newly discovered" evidence because Mr. Chapman said he had told Ms. Raynor, after Dr. Kelly testified on May 31, 2012, that Mr. Chapman had overheard the earlier conversation between Ms. Raynor and Dr. Kelly about the smoking preclusion. The court determined Ms. Raynor had access to Mr. Chapman's testimony well in advance of the imposition of sanctions, so the evidence was not "newly discovered." Further, the court held that Ms. Raynor had failed to act with responsible diligence to question Mr. Chapman at any time after May 31, 2012. The court reaffirmed its finding that Dr. Kelly's testimony was credible, whereas Mr. Chapman's testimony was contradictory and suspiciously timed to provide an "alibi" for Ms. Raynor. The court refused to reconsider the sanctions, based on Mr. Chapman's testimony.

On May 22, 2015, Ms. Raynor filed a motion for clarification of this Court's February 18, 2015 order. By order entered May 27, 2015, this Court granted her motion and stated the February 19, 2015 emergency *supersedeas* order remained in effect until all of Ms. Raynor's appeals are exhausted.

Ms. Raynor raises the following issues for our review:

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING SANCTIONS AGAINST [MS.] RAYNOR FOR CONTEMPT AND VIOLATION OF 42 PA.C.S.A. § 2503(7) IN THE ABSENCE OF EVIDENCE ESTABLISHING THAT [MS.] RAYNOR ENGAGED IN WILLFUL VIOLATION OF A COURT ORDER OR ANY VEXATIOUS, OBDURATE OR DILATORY CONDUCT?

WHETHER THE TRIAL COURT COMMITTED NUMEROUS PROCEDURAL ERRORS, DEPRIVED [MS.] RAYNOR OF HER RIGHT TO DUE PROCESS UNDER THE LAW AND ABANDONED ITS ROLE AS NEUTRAL ARBITER BY:

i.    IMPOSING CRIMINAL CONTEMPT SANCTIONS ON [MS.] RAYNOR WITHOUT AFFORDING HER THE REQUISITE DUE PROCESS PROTECTIONS GUARANTEED BY THE UNITED STATES AND PENNSYLVANIA CONSTITUTIONS?

ii.   IMPROPERLY PLACING THE BURDEN OF PROOF ON [MS.] RAYNOR TO ESTABLISH THAT SHE *COMPLIED* WITH THE PRECLUSION ORDER, RATHER THAN REQUIRING PLAINTIFF TO ESTABLISH THAT [MS.] RAYNOR *VIOLATED* THE ORDER?

iii.  BY ACCEPTING—AS THE SOLE SUBSTANTIVE EVIDENCE SUPPORTING ITS CONCLUSION— INADMISSIBLE HEARSAY STATEMENTS FROM [DR.] KELLY ELICITED BY THE COURT ITSELF DURING A PROCEEDING IN WHICH [MS.] RAYNOR HAD NO NOTICE THAT SHE WAS CHARGED WITH CONTEMPT, WAS NOT A PARTY TO THE ACTION AND WAS AFFORDED NO RIGHT TO CROSS-EXAMINATION?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT IMPOSED SANCTIONS IN THE TOTAL AMOUNT OF $946,197.16 WITHOUT A HEARING, AND WITHOUT COMPETENT EVIDENCE TO ESTABLISH THE REASONABLENESS OF THE AMOUNT IN CIRCUMSTANCES WHERE THE AMOUNT IMPOSED BORE NO REASONABLE RELATIONSHIP TO ANY LOSS INCURRED AND HENCE WAS PUNITIVE IN NATURE?

(Ms. Raynor's Brief at 3-4).

In her issues combined, Ms. Raynor initially argues the law assigned to Plaintiff the burden of proof regarding her motion for civil contempt and sanctions against Ms. Raynor. Ms. Raynor asserts Plaintiff's burden explicitly required Plaintiff to prove Ms. Raynor had notice of a specific order, freely violated the order, and acted with wrongful intent. Ms. Raynor contends Plaintiff failed to point to any order that expressly required defense counsel to warn their expert witnesses about precluded topics at any time, but particularly just before the expert witnesses took the stand; and there was none. Ms. Raynor avers Plaintiff relied solely on Dr. Kelly's May 31, 2012 trial testimony as proof that Ms. Raynor had intentionally violated the smoking preclusion order. Ms. Raynor maintains to the contrary that Dr. Kelly's equivocal testimony on that date failed to demonstrate Ms. Raynor had violated the smoking preclusion order or that Ms. Raynor had not informed him of the smoking ban. Ms. Raynor asserts the court used this scant testimony to shift Plaintiff's burden improperly to Ms. Raynor to prove she had warned Dr. Kelly of the ban on decedent's smoking history.

Ms. Raynor directs our attention to earlier in the 2012 trial transcript, where the court purposely declined to enter an order directing defense counsel to remind their expert witnesses about the smoking ban immediately before the witnesses took the stand. Ms. Raynor submits nothing in the existing pretrial smoking preclusion order required defense attorneys to inform their witnesses that the smoking ban had been reduced to an order

or to warn their expert witnesses about the smoking ban immediately before the witnesses took the stand. In any event, Ms. Raynor declares she did tell Dr. Kelly about the smoking ban before the trial began. Ms. Raynor claims the court rebuffed her efforts to introduce testimony, immediately following Dr. Kelly's violation, to show Ms. Raynor had told Dr. Kelly about the smoking ban. Ms. Raynor asserts the testimony of her witnesses offered at the later sanctions hearings confirmed she had warned Dr. Kelly not to mention decedent's smoking habit in his trial testimony. Ms. Raynor contends the testimony of Mr. Moore and Dr. Geller at the subsequent sanctions hearings was materially consistent and corroborated her own statements to the court that she had warned Dr. Kelly several times about the smoking ban. Ms. Raynor avers the court likewise erroneously disregarded Mr. Chapman's later testimony on remand, despite its substantial consistency with the testimony of her other witnesses.

Ms. Raynor further insists Dr. Kelly's own testimony both on May 31, 2102, and later at the contempt hearing, at best demonstrates that he "could not remember" what Ms. Raynor had told him concerning the smoking ban. Ms. Raynor asserts Dr. Kelly's "inability to recall" did not directly contradict the testimony of her witnesses, who all testified Ms. Raynor had in fact warned Dr. Kelly not to mention at trial the topic of decedent's smoking habit. Ms. Raynor contends the court simply rejected the testimony of her witnesses at the contempt hearings as suspicious and/or untimely, without

any record support for those conclusions. Ms. Raynor avers the court had no basis to discredit her witnesses' testimony in favor of Dr. Kelly's equivocal and evasive testimony. On this record, Ms. Raynor maintains the court improperly shifted the burden of proof to her in the contempt proceedings and erred in finding she had willfully violated the smoking preclusion order.

Ms. Raynor also suggests the court ultimately held her in "criminal" contempt, given the nature of the sanctions imposed. Ms. Raynor contends civil contempt sanctions are for the purpose of inducing compliance with court proceedings; and, despite her full compliance with the court's order, the court still sanctioned her. Ms. Raynor asserts the court only casually questioned Dr. Kelly about his trial preparation immediately after he had violated the smoking ban during the first trial, but the court gave Ms. Raynor no opportunity to cross-examine Dr. Kelly. Ms. Raynor alleges the court abandoned neutrality by interrupting Dr. Kelly and shaping his responses.

Ms. Raynor also avers the court erred in admitting Dr. Kelly's earlier trial statements in the later sanctions hearing, where the earlier statements constituted inadmissible hearsay on two grounds: (1) Ms. Raynor was not a party in the first trial and (2) she had no opportunity to cross-examine Dr. Kelly. Her opportunity to cross-examine Dr. Kelly at the later sanctions hearing did not cure the hearsay nature of his earlier statements and was, in any event, too late to be effective.

Additionally, Ms. Raynor asserts she was entitled to a separate hearing

on the reasonableness of the sanctions imposed. Ms. Raynor claims an evidentiary hearing was essential to establish key facts which the court should have considered in making its sanctions assessment. For example, Ms. Raynor states Plaintiff failed to prove actual harm to the value of her case, because Plaintiff's award was significantly higher in the second trial, where evidence of decedent's smoking habit was actually permitted. Likewise, Ms. Raynor claims the sanctions evidence of counsel's unbilled hourly time charges offered by Plaintiff did not represent actual loss to Plaintiff. Ms. Raynor insists the award of attorneys' fees associated with the first trial was improper primarily because Plaintiff's attorneys worked on a contingent-fee basis, and Plaintiff was not responsible for the attorneys' unbilled time charges. Ms. Raynor contends the court deprived her of the opportunity to challenge the appropriateness and reasonableness of the counsel fees/sanctions by refusing to hold a hearing on the amount of sanctions imposed. Further, Ms. Raynor maintains Plaintiff and her attorneys could not have avoided the cost of the first trial, even if Dr. Kelly had honored the smoking ban. Ms. Raynor alleges the court's excessive sanctions were punitive both in amount and intent, which was to punish her for Dr. Kelly's errant comment. Ms. Raynor concludes the trial court abused its discretion by finding her liable for contempt based on this record and imposing excessive sanctions.

Plaintiff counters Dr. Kelly's testimony and responses to the court's

inquiries, taken from the May 31, 2012 trial transcript, were alone sufficient to support the finding of contempt and the sanctions imposed. Plaintiff asserts the court properly admitted the Dr. Kelly's testimony from May 31, 2012, at the later contempt hearing, as party admissions. Plaintiff contends Dr. Kelly's mere statement that he "did not remember" having discussed the order constituted sufficient grounds for sanctions, because Ms. Raynor had a duty to prepare Dr. Kelly properly by cautioning him immediately before he took the stand, even if no order expressly required her to do so. Plaintiff insists the necessity for cautioning Dr. Kelly just before he took the stand was "inherent" in the smoking preclusion order, because Ms. Raynor knew Dr. Kelly was a "very busy emergency room physician with important administrative duties" who might not remember her prior instructions. Plaintiff also contends Ms. Raynor intentionally framed and asked a question designed to prompt Dr. Kelly to mention decedent's smoking habit in his response.

Plaintiff avers the court had discretion to impose sanctions from the bench during the first trial; instead, the court gave Ms. Raynor an additional opportunity to explain her trial conduct at the separate contempt hearings. Plaintiff maintains Ms. Raynor had the initial burden of proof only in her capacity as the proponent of new witness testimony, when she introduced Mr. Chapman's testimony. The court, however, concluded she failed to meet her burden to deserve reconsideration of the sanctions award.

Plaintiff further argues Dr. Geller and Mr. Moore were both "interested parties" in the later contempt proceedings, and their testimony was therefore innately untrustworthy. Plaintiff asserts their testimony was also inconsistent, which further demonstrated the unreliability of their statements. Plaintiff indicates Ms. Raynor's later testimony was likewise suspicious, because Ms. Raynor failed to accuse Dr. Kelly promptly of lying when he first said he did not remember discussing the smoking preclusion order with her. Plaintiff contends Ms. Raynor's evolving story and her post-trial "change in attitude" toward Dr. Kelly demonstrate her unreliability as a witness. Plaintiff concludes the extent and amount of the court's sanctions was appropriate and necessary, given the complexities of the trial and the unfairness that would result if the court did not compensate Plaintiff for all of the damages Ms. Raynor caused, including all counsel fees and costs associated with the 2012 trial. For the following reasons, we reject Plaintiff's contentions and agree with Ms. Raynor's position.

This Court reviews contempt orders subject to the following principles:

> [A]n appellate court has the authority to determine whether the findings of the trial court support its legal conclusions, but may only interfere with those conclusions if they are unreasonable in light of the trial court's factual findings. This Court will not reverse or modify a final decree unless there has been an error of law or an abuse of discretion, **or if the findings are not supported by the record, or there has been a capricious disbelief of the credible evidence**. Furthermore [e]ach court is the exclusive judge of contempt against its process, and on appeal its actions will be reversed only when a plain abuse of discretion occurs.

*Mrozek v. James*, 780 A.2d 670, 673 (Pa.Super. 2001) (internal citations and quotation marks omitted) (emphasis added). As well, the amount of monetary sanctions is subject to an abuse of discretion standard; however, sanctions deemed excessive under the circumstances might compel reversal or remand for modification. *Commonwealth v. Bowden*, 576 Pa. 151, 186, 838 A.2d 740, 761 (2003) (reiterating ability to comply is key consideration in determining propriety of civil contempt sanctions; court must consider defendant's financial resources before entering monetary contempt sanction).

The distinction between criminal and civil contempt lies in the court's dominant purpose for using its contempt power. *Diamond v. Diamond*, 792 A.2d 597, 600 (Pa.Super. 2002).

> The factors generally said to point to a civil contempt are these: (1) [w]here the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled [captioned] in the original…action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the [respondent] in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in nature and do not of themselves constitute crimes or conduct by the [respondent] so contumelious that the court is impelled to act on its own motion.

*Stahl v. Redcay*, 897 A.2d 478, 486 (Pa.Super. 2006), *appeal denied*, 591 Pa. 704, 918 A.2d 747 (2007) (citations omitted).

A judgment in a civil contempt proceeding for the benefit

> of a private [complainant] will, of course, incidentally vindicate the authority of the court just as on the other hand a criminal contempt judgment, which is punitive, may often advance private interests. But the test is the dominant purpose, not the incidental result.

*Id.* at 487 (internal citation omitted). Importantly,

> To be punished for contempt, a party must not only have violated a clear order, but that order must have been **definite, clear, and specific**—leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct. Because the order forming the basis for civil contempt must be strictly construed, any ambiguities or omissions in the order must be construed in favor of the defendant. In such cases, a contradictory order or an order whose specific terms have not been violated will not serve as the basis for a finding of contempt. To sustain a finding of civil contempt, the complainant must prove certain distinct elements: (1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent. A person may not be held in contempt of court for failing to obey an order that is too vague or that cannot be enforced.

*Id.* at 489 (emphasis in original) (citation omitted). In other words, the alleged contemnor must know of the prohibited conduct, with any ambiguities, omissions, or uncertainties in the order construed in favor of the alleged contemnor, the act constituting the violation must be deliberate, and the act of the alleged contemnor must have been done with improper intent. *Id.* *See also In re Contempt of Cullen*, 849 A.2d 1207, 1210 (Pa.Super. 2004), *appeal denied*, 582 Pa. 676, 868 A.2d 1201 (2005).

"In proceedings for civil contempt of court, the general rule is that the burden of proof rests with the complaining party to demonstrate that the

defendant is in noncompliance with a court order." ***MacDougall v. MacDougall***, 49 A.3d 890, 892 (Pa.Super. 2012), *appeal denied*, 621 Pa. 679, 75 A.3d 1282 (2013). "However, a mere showing of noncompliance with a court order, or even misconduct, is never sufficient alone to prove civil contempt." ***Habjan v. Habjan***, 73 A.3d 630, 637 (Pa.Super. 2013). ***See also In re Contempt of Cullen, supra***. "[U]nless the evidence establishes an intentional disobedience or an intentional [disregard] of the lawful process of the court, no contempt has been proven." ***Ricci v. Geary***, 670 A.2d 190, 192 (Pa.Super. 1996).

Notably, "the holding of an individual in contempt for the actions of a third party would appear inappropriate and, therefore, unsupportable unless the individual con[s]ciously directed the third party to act as he did and possessed such authority over the third party that [the directing individual] could compel compliance with the directive." ***Commonwealth v. Michel***, 522 A.2d 90, 93 (Pa.Super. 1987). Only then can the third party's act "be imputed to the directing party. However, even then it would be necessary to find wrongful intent." ***Id.*** The proponent must prove and the court must still find wrongful intent even if it determines the contemnor directed the third party's actions. ***Yeager v. Kavic***, 765 A.2d 812, 815 (Pa.Super. 2000), *appeal denied*, 567 Pa. 745, 788 A.2d 378 (2001).

The imposition of counsel fees can serve as a sanction upon a finding of civil contempt. ***Rhoades v. Pryce***, 874 A.2d 148, 153 (Pa.Super. 2005)

(*en banc*), *appeal denied*, 587 Pa. 724, 899 A.2d 1124 (2006).

> [T]he court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved [complainant] as compensation for the special damages he may have sustained by reason of the contumacious behavior of the offender.
>
> *        *        *
>
> Where compensation is intended, a fine is imposed, payable to the complainant.  Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.

*Stahl, supra* at 487 (internal citation omitted).  *See also Jack Rees Nursing and Rehabilitation Services v. Hersperger*, 600 A.2d 207, 209 (Pa.Super. 1991) (stating contempt fine, meant to compensate complainant, must be based on evidence of complainant's actual loss).  For example, "[A] court may require the contemnor to compensate the opposing party for losses incurred as a result of the violation or reimburse the party's attorneys' fees and costs."  *Gunther v. Bolus*, 853 A.2d 1014, 1016 (Pa.Super. 2004), *appeal denied*, 578 Pa. 709, 853 A.2d 362 (2004).

Nevertheless, an award of counsel fees is intended to reimburse an innocent litigant for the expenses the conduct of an opponent makes necessary, such as the cost of the contempt hearing, so it can be coercive and compensatory but it cannot be punitive.  *Mrozek, supra*.  Moreover, "[T]he court may not convert a coercive [ruling] into a punitive one by imposing conditions that a contemnor cannot perform and thereby purge

- 54 -

[herself] of the contempt." ***Schnabel Assoc., Inc. v. Building and Constr. Trades Council of Philadelphia and Vicinity, AFL-CIO***, 487 A.2d 1327, 1338 (Pa.Super. 1985). Importantly, when fixing the amount of sanctions, the court must also consider the financial resources of the alleged contemnor as well as the financial consequences of the burden imposed by the sanctions. ***Id.*** ***See also Colbert v. Gunning***, 533 A.2d 471, 472 (Pa.Super. 1987) (holding when court found appellant in civil contempt, court did not have authority to impose sanctions for purpose of inflicting punishment on appellant; unconditional authority in civil contempt means court may exercise civil contempt power to compel performance but not to inflict punishment).

We further observe: "Pennsylvania generally adheres to the American Rule, under which a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." ***Samuel-Bassett v. Kia Motors America, Inc.***, 613 Pa. 371, 464, 34 A.3d 1, 57 (2011). Pennsylvania courts can award counsel fees to the prevailing party but only "when authorized by statute or rule of court, upon agreement of the parties, or pursuant to some other recognized case law exception." ***Olympus Corp. v. Canady***, 962 A.2d 671, 677 (Pa.Super. 2008).

An award of counsel fees under 42 Pa.C.S.A. § 2503 is distinct from a finding of contempt that might include sanctions in the form of counsel fees.

*Wood v. Geisenhemer-Shaulis*, 827 A.2d 1204, 1207 (Pa.Super. 2003).

Section 2503 provides as follows:

### § 2503.  Right of participants to receive counsel fees

The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:

\* \* \*

**(7)** Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter.

42 Pa.C.S.A. § 2503.  "Classically, in considering a motion to award counsel fees under [S]ection 2503, an evidentiary hearing is generally required." *Wood, supra*.  In this context as well, "The order that forms the basis for the contempt process in civil proceedings must be definitely and strictly construed.  Any ambiguity or omission in the order forming the basis of the civil contempt proceeding must be construed in favor of the [accused]. Where the order is contradictory or the specific terms of the order have not been violated, there is no contempt." *Id.* at 1207-08.

"[A]ny award of counsel fees pursuant to 42 Pa.C.S.A. § 2503(7) must be supported by a trial court's specific finding of dilatory, obdurate or vexatious conduct." *Township of South Strabane v. Piecknick*, 546 Pa. 551, 560, 686 A.2d 1297, 1301 (1996).  The trial court does not have discretion to award counsel fees to the prevailing party in any contempt case absent record support for these specific findings. *Id.* at 559.  For example,

a court may find dilatory conduct where the record demonstrates counsel's lack of diligence delayed proceedings and caused additional legal work. ***Gertz v. Temple University-Commonwealth System of Higher Education***, 661 A.2d 13, 17 n.2 (Pa.Super. 1995). A court may award contempt sanctions for vexatious conduct under Section 2503(7) when counsel's behavior is **wholly** unreasonable. ***Kelley v. Thompson***, 474 A.2d 44 (Pa.Super. 1984) (affirming imposition of modest sanction for plaintiff's counsel's arbitrary and unfounded refusal to sign settlement order). "[T]he essential due process requisites for a finding of civil contempt are notice and an opportunity to be heard." ***In re Contempt of Cullen, supra*** at 1211 (quoting ***Schnabel Assoc., Inc., supra*** at 1334). If contempt sanctions are based on the violation of a court order, then due process requires notice of the violations alleged and an opportunity for explanation and defense. ***Diamond, supra*** at 601. ***See also Garr v. Peters***, 773 A.2d 183, 191 (Pa.Super. 2001) (stating: "Procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case").

This Court has previously evaluated the reasonableness of attorneys' fees by examining the following factors:

> [T]he amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and

> standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*Holz v. Holz*, 850 A.2d 751, 761 (Pa.Super. 2004), *appeal denied*, 582 Pa. 700, 871 A.2d 192 (2005) (quoting *Gilmore by Gilmore v. Dondero*, 582 A.2d 1106, 1109 (Pa.Super. 1990). "[I]n exercising its discretion, [the trial court] must evaluate the reasonableness of time spent by counsel in relation to the particular case." *Danks v. Government Employees Ins. Co.*, 453 A.2d 655, 656 (Pa.Super. 1982).

Although the responsibility for setting counsel fees lies primarily with the trial court, this Court has the power to reverse that exercise when there is plain error. *Gilmore, supra* at 1108. "Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award." *Id.* Significantly, cases involving contingent fee arrangements intrinsically involve some risk that counsel will recover no money for the professional services rendered. *Id.* at 1110. In other words, by virtue of a contingency fee arrangement, counsel takes on the risk that he will not get paid as well as the risk that he will lose the money advanced for the costs of his client's suit. *See id.*

With respect to admission of evidence, "The basic requisite for the admission of any evidence is that it be both competent and relevant.

Evidence is competent if it is material to the issues to be determined at trial, and relevant if it tends to prove or disprove a material fact in issue."

***Moroney v. General Motors Corp.***, 850 A.2d 629 (Pa.Super. 2004), *appeal denied*, 580 Pa. 714, 862 A.2d 1256 (2004). The Pennsylvania Rules of Evidence[11] provide:

> **Rule 401.  Test for Relevant Evidence"**
>
> Evidence is relevant if:
>
> (a)  it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b)  the fact is of consequence in determining the action. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
>
> > *Comment*:  This rule is identical to F.R.E. 401.
> >
> > Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason, experience, scientific principles and the other testimony offered in the case.
> >
> > The relevance of proposed evidence may be dependent on evidence not yet of record.  Under Pa.R.E. 104(b), the court may admit the proposed evidence on the condition that the evidence supporting its relevance be introduced later.

---

[11] On January 17, 2013, the legislature rescinded the prior version of the rules of evidence and replaced them with the current version of the rules which went into effect on March 18, 2013.  Here, the first trial occurred in 2012 but the contempt/sanctions proceedings extended into 2014.  Nevertheless, for our purposes the rules are essentially the same.

Pa.R.E. 401.  Rule 402 states:

### Rule 402.  General Admissibility of Relevant Evidence

All relevant evidence is admissible, except as otherwise provided by law.  Evidence that is not relevant is not admissible.

> *Comment*: Pa.R.E. 402 differs from F.R.E. 402.  The Federal Rule specifically enumerates the various sources of federal rule-making power.  Pa.R.E. 402 substitutes the phrase "by law."
>
> Pa.R.E. 402 states a fundamental concept of the law of evidence.  Relevant evidence is admissible; evidence that is not relevant is not admissible.  This concept is modified by the exceptions clause of the rule, which states another fundamental principle of evidentiary law—relevant evidence may be excluded by operation of constitutional law, by statute, by these rules, by other rules promulgated by the Supreme Court or by rules of evidence created by case law.

\* \* \*

Pa.R.E. 402.  In other words, evidence that might be relevant to an issue in a particular case can still be incompetent and inadmissible because one or more established rules of evidence preclude admission.  ***Id.  See also Commonwealth v. Paddy***, 569 Pa. 47, 70-71, 800 A.2d 294, 308 (2002) (stating: "Evidence that is relevant may nevertheless be inadmissible if it violates a rule of competency, such as the hearsay rule").  Pennsylvania Rule of Evidence 801 defines hearsay as follows:

### Rule 801.  Definitions That Apply to This Article

**(a) Statement.**  "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the

person intended it as an assertion.

**(b)    Declarant.**    "Declarant" means the person who made statement.

**(c)    Hearsay.**  "Hearsay" means a statement that

(1)    the declarant does not make while testifying at the current trial or hearing; and

(2)    a party offers in evidence to prove the truth of the matter asserted in the statement.

*    *    *

Pa.R.E. 801.  Generally, hearsay is inadmissible, except as provided by the rules of evidence, other Pennsylvania Supreme Court rules, or by statute.

Pa.R.E. 802.    Rule 803 lists various exceptions to the hearsay rule, regardless of whether the declarant is available as a witness, and states in part:

> **Rule  803.      Exceptions  to  the  Rule  Against Hearsay—Regardless of Whether the Declarant Is Available as a Witness**
>
> The following are not excluded by the rule against hearsay, regardless  of  whether  the  declarant  is  available  as  a witness:
>
> *    *    *
>
> **(25) An Opposing Party's Statement.**  The statement is offered against an opposing party and:
>
> (A)    was  made  by  the  party  in  an  individual  or representative capacity;
>
> (B)    is  one  the  party  manifested  that  it  adopted  or believed to be true;

(C)   was made by a person whom the party authorized to make a statement on the subject;

(D)   was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E)   was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement may be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

> *Comment*:   Pa.R.E.   803(25)   differs   from   F.R.E. 801(d)(2), in that the word "must" in the last paragraph has been replaced with the word "may."
>
> The Federal Rules treat these statements as "not hearsay" and places them in F.R.E 801(d)(2).   The traditional view was that these statements were hearsay, but admissible as exceptions to the hearsay rule.   The Pennsylvania Rules of Evidence follow the traditional view and place these statements in Pa.R.E. 803(25), as exceptions to the hearsay rule—regardless of the availability of the declarant.   This differing placement is not intended to have substantive effect.
>
> The statements in this exception were traditionally, and in prior versions of both the Federal Rules of Evidence and the Pennsylvania Rules of Evidence, called admissions, although in many cases the statements were not admissions as that term is employed in common usage.   The new phrase used in the federal rules—an opposing party's statement—more accurately describes these statements and is adopted here.

Pa.R.E. 803(25) and *Comment*.   Rule 804 provides exceptions to the rule against hearsay, when the declarant is **unavailable** as a witness, and states in pertinent part as follows:

**Rule 804. Exceptions to the Rule Against Hearsay—When the Declarant is Unavailable as a Witness**

**(a) Criteria for Being Unavailable.** A declarant is considered to be unavailable as a witness if the declarant:

\* \* \*

(3) **testifies to not remembering the subject matter**;

\* \* \*

**(b) The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

(1) *Former testimony*. Testimony that:

(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

(B) **is now offered against a party who had**—or, in a civil case, whose predecessor in interest had—**an opportunity and similar motive to develop it by direct, cross-, or redirect examination**.

\* \* \*

Pa.R.E. 804 (some emphasis added). If former testimony is admitted under the hearsay exception in Pa.R.E. 804(b)(1)(B), due process is satisfied only if the statements are introduced against a party who has had an adequate opportunity for cross-examination in the previous proceeding. *Commonwealth v. Stays*, 70 A.3d 1256 (Pa.Super. 2013). If a party attempts to introduce a declarant's prior testimony, the court must have granted the opposing party a full and fair opportunity to cross-examine the

declarant **at the earlier proceeding**.  *Commonwealth v. Bazemore*, 531 Pa. 582, 588, 614 A.2d 684, 687 (1992).  Additionally, "the issues in the prior proceeding and the purpose for which the testimony was there offered must have been such that the present opponent had an adequate motive for testing on cross-examination the credibility of the testimony now offered." *Commonwealth v. Smith*, 647 A.2d 907, 911 (Pa.Super. 1994) (quoting *Commonwealth v. Velasquez*, 449 Pa. 599, 601 n.3, 296 A.2d 768, 770 n.3 (1972)).  "It is always the right of a party against whom a witness is called to show by cross-examination that he has an interest direct or collateral in the result of the [proceeding]…." *Commonwealth v. Cheatham*, 429 Pa. 198, 203, 239 A.2d 293, 296 (1968) (quoting *Lenahan v. Pittston Coal Mining Co.*, 221 Pa. 626, 629, 70 A. 884, 885 (1908)).  Where the credibility of the witness is crucial to the outcome, the court must permit cross-examination on bias.  *Id.*

In the instant case, Plaintiff first filed her MIL on November 21, 2011, to preclude any evidence, testimony, and/or argument by Defendants regarding the decedent's smoking history on the grounds that Defendants had "failed to offer any medical expert opinion" to support "a causal connection between [decedent's] smoking and either the negligent failure of Defendants to diagnose [decedent's] lung cancer in May 2007, or the progression of her cancer between May 2007 and her death in July 2009, and where Plaintiff has offered expert opinion that continued smoking by

[decedent] after the time [Defendants] failed to diagnose the lung tumor, had no effect on the progress of her cancer." By order dated December 5, and docketed December 6, 2011, the court originally entered a pretrial order that granted Plaintiff's MIL in part to preclude evidence, testimony and/or argument by the defendants regarding decedent's smoking history as irrelevant and unfairly prejudicial on the **issue of liability**. The court determined that decedent's smoking history was relevant to the issue of damages. The court ordered the trial bifurcated into two phases with the same jury; if the jury found liability then decedent's smoking history would be admissible in the second phase, to follow immediately, in which damages would be assessed. If Plaintiff chose to withdraw the MIL, the trial would not be bifurcated and decedent's smoking history would be admissible with a cautionary instruction on its limited relevance.

Due to later changes in the witness list, Plaintiff renewed her pre-trial motion to preclude evidence at trial of decedent's smoking history and asked the trial court to grant the motion in its entirety, not just in part, because now there was no defense expert testimony supporting any issue for which smoking was relevant, even for life expectancy. (***See*** N.T. MIL, 5/16/12, at 8; R.R. at 311a.)

### PRECLUSION ORDER

In response to Plaintiff's renewed request, the trial court issued a substituted pretrial order on May 21, 2012, which stated in relevant part as

follows:

> … Upon consideration of Plaintiff's Motion *In Limine* to Preclude Evidence, Testimony, and/or Argument by Defendants Regarding Decedent's Smoking History, and any response thereto, it is hereby ORDERED and DECREED
>
> 1. Plaintiff's Motion is GRANTED. [handwritten: ", by AGREEMENT"]
>
> 2. Defendants are precluded from presenting any evidence, testimony, and/or argument regarding Decedent's smoking history.
>
> [handwritten⇓]
> 3. This order will [supersede] Judge Rau's order of 12-5-2011 by agreement of the parties.

(Trial Court Order, dated May 16, 2012, filed May 21, 2012, at 1; R.R. at 372a). Plainly, the order precluded defendants from presenting any evidence, testimony, or argument regarding decedent's smoking history. The order, however, did not expressly require defense counsel either to inform their witnesses that the smoking ban had been reduced to an order or to remind their defense witnesses about the smoking ban immediately before the witnesses took the stand. When Plaintiff asked the court to issue an explicit directive to defense counsel to remind their witnesses immediately before they took the stand, the court intentionally refused. (*See* N.T. Trial #1, 5/30/12, A.M. Session, at 5-6; R.R. at 732a-733a.) Although the court's May 16, 2012 order informs counsel for the parties of the scope of inadmissible evidence on decedent's smoking history, it cannot serve as the order of record to support the court's finding of civil contempt

against Ms. Raynor. *See Stahl, supra*. Likewise, the court's reference to the parties' "understanding," or the parties' being "on notice," of Plaintiff's request for the additional order, which the court refused to enter, does not constitute the kind of "definite, clear, and specific order" required for a finding of civil contempt in this case. *See id.* We must strictly construe any ambiguities, omissions, or uncertainties in the order at issue in favor of Ms. Raynor as the alleged contemnor. *Id.*; *In re Contempt of Cullen, supra*. Thus, we hold the record from the 2012 trial, on which Plaintiff rested, lacks the requisite foundational order to support the contempt ruling. *See Stahl, supra*; *Mrozek, supra*.

## IMPROPER BURDEN SHIFTING

Additionally, we reiterate that Plaintiff had the burden to prove contempt, *i.e.*, to show more than just a violation of a court order. Contrary to Plaintiff's contention, Dr. Kelly's May 31, 2012 statement on decedent's smoking habit, absent more, does not carry that burden. In Plaintiff's motion for contempt and at the contempt hearing, Plaintiff rested solely on the Dr. Kelly's May 31, 2012 testimony from the first trial, and his responses to the court's impromptu inquiries, to support the inference that Dr. Kelly was completely unaware of the smoking ban. These transcripts, however, are at best misleading because the court's questions to Dr. Kelly and his responses are capable of multiple reasonable interpretations, for example, that (1) Dr. Kelly did not know the ban on smoking testimony had been

reduced to an order; or (2) he did not know about the smoking ban at all; or (3) he was not told or reminded about the smoking ban (order or generally) on May 31, 2012; or (4) he was not told or reminded about the smoking ban (order or generally) immediately before he took the stand; or (5) the smoking ban did not affect the context of cardiac risk factors. None of these interpretations can be either favored or excluded. After all, the court had instructed Dr. Kelly not to discuss his trial testimony with counsel during the short break between his credentials testimony and his substantive testimony. Thus, the court's questions and Dr. Kelly's responses do not lead to a definitive conclusion. Quite the opposite, Dr. Kelly's May 31, 2012 testimony demonstrated only Dr. Kelly's confusion about why he was being questioned by the court and his professed inability to recall he knew about the smoking ban.

Likewise, Dr. Kelly's May 31, 2012 testimony on the issue of the smoking ban was arguably hearsay and subject to exclusion, because his testimony was offered later against Ms. Raynor, who had no adequate opportunity to cross-examine Dr. Kelly during the **earlier proceeding**. *See Stays, supra*. Similarly, Dr. Kelly was Ms. Raynor's emergency medicine expert, the medical malpractice trial was in progress, and as her defense expert Dr. Kelly was mid-testimony. Believing Dr. Kelly's statement was just a mistake, Ms. Raynor likewise had no motive or incentive to get into a conflict with her own expert and attack his credibility or even call his

credibility into doubt on this collateral matter, create a trial within a trial, and risk the exclusion of his entire testimony. **_See Smith, supra_**.

Nevertheless, without any substantiation, Plaintiff simply interprets Dr. Kelly's "lack of memory" as conclusive proof that Ms. Raynor failed to warn him **at all** about the smoking ban. Plaintiff explains this leap of reason by claiming Dr. Kelly would have remembered the smoking ban if he had been warned about it just before he went on the stand. The problem with this rationale is twofold: (1) the smoking preclusion order did not direct counsel to remind their witnesses of the smoking ban just before they took the stand; and (2) Dr. Kelly's blunder could still have occurred regardless of any warning at whatever time, because witnesses often surprise counsel with their answers despite preparation. In any event, no amount of speculation can show that Dr. Kelly's May 31, 2012 comment on decedent as a smoker should be attributed to Ms. Raynor as proof that Ms. Raynor willingly or intentionally violated the smoking preclusion order. Plaintiff may not impute Dr. Kelly's third-party act to Ms. Raynor without establishing that Ms. Raynor consciously directed or possessed such authority over Dr. Kelly to make him violate the smoking ban. **_See Michel, supra_**. The simple fact that Dr. Kelly was Ms. Raynor's expert witness, absent more, is not enough to impute that kind of authority to Ms. Raynor. In any event, Plaintiff would still have to prove Ms. Raynor's wrongful intent. **_See Yeager, supra_**.

Further, there is absolutely no substantive proof that Ms. Raynor

intentionally framed or asked her question in a manner designed to prompt Dr. Kelly to mention decedent's smoking habit spontaneously in his response. Decedent presented in the emergency room with complaints of chest pain, shortness of breath on exertion, cough, profuse sweating, nausea, and frontal headache. Decedent's medical history included osteoporosis, vascular disease, hypothyroidism, and hypertension. Ms. Raynor's question to Dr. Kelly concerning decedent's cardiac risk factors, when read in context, was a wholly legitimate inquiry. Ms. Raynor was in the midst of showing the reasonableness of Dr. Geller's immediate and primary treatment approach, *i.e.*, to rule out a heart attack. Notably, Plaintiff's counsel posed no objection to Ms. Raynor's question. Therefore, we reject Appellees' supposition that **any** question concerning decedent's cardiac risk factors was irrelevant and molded just to entice Dr. Kelly to mention decedent's smoking history.

Even if Ms. Raynor's question about cardiac risk factors triggered Dr. Kelly's comment on decedent's smoking habit, Plaintiff cannot show Ms. Raynor acted with wrongful intent. Dr. Kelly's statement that decedent was a smoker violated the ban on decedent's smoking habit. Absent evidence, however, that Dr. Kelly's answer was a deliberate violation **and** that he gave it with a wrongful intent that could be attributed to Ms. Raynor, Plaintiff failed to prove Ms. Raynor committed civil contempt. The trial record on which Plaintiff's counsel rested is devoid of any evidence of collusion,

intrigue, or wrongful purpose on the part of Ms. Raynor. **See Stahl, supra**; **Yeager, supra**; **Ricci, supra**; **Michel, supra**.

Plaintiff's failure to prove Ms. Raynor was in civil contempt of the court's smoking preclusion order meant that Ms. Raynor had no obligation to present witnesses in her defense. Yet, the court's statement, that Ms. Raynor's witnesses failed to "come forward in a timely manner to explain," demonstrates how the court prematurely shifted the burden to Ms. Raynor to present a defense. (**See** Trial Court Opinion, dated April 24, 2015, at 7.) Plaintiff was the party initially obligated to establish Ms. Raynor was in civil contempt, which Plaintiff failed to do. The court erred by shifting the legal burden to Ms. Raynor to prove her innocence, based solely on Dr. Kelly's equivocal May 31, 2012 trial testimony. **See MacDougall, supra**; **Stahl, supra**; **Mrozek, supra**.

## CREDIBILITY DETERMINATIONS

On June 1, 2012, the day after Dr. Kelly's violation of the smoking ban, Ms. Raynor offered to present testimony from Dr. Geller, Mr. Moore, Dr. Harris, and herself. Plaintiff echoed Ms. Raynor's request to introduce Mr. Moore's testimony as to whether Mr. Moore observed Ms. Raynor warn Dr. Kelly. The court denied the requests at that time. The next available opportunity for Ms. Raynor to present any testimony was during the contempt hearing in 2014, at which point all four witnesses testified. The record simply does not support the court's declaration that Ms. Raynor's

- 71 -

"untimely" disclosure of Dr. Geller and Mr. Moore's evidence rendered their testimony unbelievable.

Following remand from this Court for a hearing in 2015, on the proposed newly discovered evidence in the form of Mr. Chapman's testimony, the court held Mr. Chapman's testimony was not "newly discovered," because Ms. Raynor was aware of Mr. Chapman's proposed testimony since the 2012 trial. The court inferred Ms. Raynor was or should have been aware of Mr. Chapman's personal knowledge that she had warned Dr. Kelly, based on Mr. Chapman's 2015 testimony, although he expressly stated his belief that Ms. Raynor had not heard him when he spoke to her at the 2012 trial. The court assumed Ms. Raynor intentionally failed to call Mr. Chapman as a witness earlier, at the 2014 contempt hearing, to her own disadvantage.

The court's other reasons to reject Mr. Chapman's testimony are also inconsistent with the established record. The court emphasized minor discrepancies in the timing of events in Mr. Chapman's testimony and the testimony of the other defense witnesses. These alleged discrepancies were insignificant and therefore immaterial, where Mr. Chapman's testimony was consistent on all key points with the testimony of Dr. Geller, Mr. Moore, Dr. Harris, and Ms. Raynor. Dr. Kelly's testimony on May 31, 2012, and later during the 2014 contempt hearing, did nothing to contradict the testimony of the other defense witnesses. The court overstated Dr. Kelly's testimony

and interpreted Dr. Kelly's failure to recollect as an affirmation that Ms. Raynor had not told him about the smoking ban. Assuming Dr. Kelly's testimony, as far as it went, was credible, his credibility did not require the court to discredit automatically the testimony of the other defense witnesses. Dr. Kelly's inability to recall in 2014 what Ms. Raynor had told him back in 2012, before the first trial, simply did not prove Ms. Raynor failed to tell him anything about the smoking ban. The court erred when it ruled that Dr. Kelly's credibility obliged it to conclude that the other defense witnesses must be incredible. Neither the timing of any of the testimony nor the purported inconsistencies are dispositive. Here, the court controlled the extent and limitations on the testimony it received in 2012. As well, the later testimony in 2014 and 2015 contained no material conflict. Nevertheless, the court swaddled its ultimate contempt decision in unnecessary "credibility determinations," which led it to a capricious distrust of reliable evidence and a plain abuse of discretion under the circumstances of this case. *See Mrozek, supra*. *See also Stahl, supra*; *In re Contempt of Cullen, supra*.

## DUE PROCESS

At the 2014 contempt hearing, Plaintiff offered Dr. Kelly's prior statements from the 2012 trial to prove Ms. Raynor had failed to warn Dr. Kelly. Plaintiff offered Dr. Kelly's 2012 testimony against Ms. Raynor, who lacked opportunity and motive to cross-examine Dr. Kelly when he gave that

testimony. At the first trial in 2012, Dr. Kelly was one of Ms. Raynor's expert witnesses. She risked undermining his credibility as a defense expert witness by vigorously discrediting his statement that he could not remember having been warned about the smoking ban in the context of cardiac risk factors. By accepting the 2012 transcript into evidence at the 2014 contempt hearing, the court fully credited Dr. Kelly's statements although Ms. Raynor had no opportunity for confrontation in 2012. This evidence was hearsay, and did not fall under any hearsay exception, where the court denied Ms. Raynor a full and fair opportunity to question Dr. Kelly or rebut his statements after his testimony on May 31, 2012. Giving Ms. Raynor the chance to question Dr. Kelly at the 2014 contempt hearing, over two years later, did not constitute a "full and fair opportunity" to cross-examine Dr. Kelly about his prior statements. Likewise, the court also violated Ms. Raynor's due process rights when the court admitted Dr. Kelly's 2012 testimony at the 2014 contempt hearing, because Ms. Raynor had no chance in 2012 to expose Dr. Kelly's potential bias and reasons for his 2012 evasive testimony. **See** Pa.R.E. 801, 804; **Bazemore, supra**; **Cheatham, supra**; **Stays, supra**; **Smith, supra**.

The court's refusal to hold a hearing on the amount of sanctions awarded similarly deprived Ms. Raynor of her ability to contest the amount of the award. The court announced without explanation that Ms. Raynor had demonstrated the "dilatory, obdurate or vexatious conduct" required for an

award of counsel fees under 42 Pa.C.S.A. § 2503(7), long after it actually awarded the sanctions. The court claimed in its February 3, 2015 opinion that it based the sanctions award on a finding of dilatory, obdurate, and vexatious conduct. Even if the court found this conduct when it awarded the sanctions on November 4, 2014, Ms. Raynor had no opportunity to contest the finding. The court did not hold an evidentiary hearing concerning the reasonableness or amount of sanctions imposed on Ms. Raynor or Ms. Raynor's ability to pay. *See Schnabel Assoc., Inc., supra* (stating that when fixing amount of sanctions, court must also consider the financial resources of alleged contemnor as well as financial consequences of burden imposed by sanctions). *See also Colbert, supra* (holding when court found appellant in civil contempt, court did not have authority to impose sanctions for purpose of inflicting punishment on appellant; unconditional authority in civil contempt means court may not exercise civil contempt power to inflict punishment). The court's refusal to hold an evidentiary hearing on the amount and financial consequences of the sanctions, as Ms. Raynor had requested, violated her due process rights. *See* 42 Pa.C.S.A. § 2503(7); *Piecknick, supra*; *Canady, supra*; *In re Contempt of Cullen, supra*; *Wood, supra*.

### REASONABLENESS OF SANCTIONS

Instead, the court based its sanctions award on a brief Plaintiff's counsel submitted, in which counsel sought $1,349,063.67 in expenses and

attorneys' fees representing the full costs and hourly fees associated with the 2012 medical malpractice trial as well as the costs and fees incurred in pursuing Plaintiff's motion for contempt/sanctions. To recover any award associated with the 2012 trial, Plaintiff had to prove damage to her case as a result of the smoking ban violation, which Plaintiff was unable to do. We are not here to revisit the wisdom of awarding Plaintiff a second trial. We do think, however, the fact that the verdict against the defense was in a disappointing amount cannot necessarily be attributed to the mention of decedent's smoking habit, notwithstanding counsel's unverified remarks about the jury's reaction to Dr. Kelly's 2012 testimony. Plaintiff's attorneys worked on a contingency fee basis. Plaintiff was not responsible for paying these alleged counsel fees. Plaintiff's attorneys incurred the risk that the case would result in an unfavorable verdict and/or a less-than-hoped-for award. The court erred when it granted Plaintiffs' attorneys recovery of their alleged fees and costs, based essentially on a discounted version of *quantum meruit* in a contingency fee case.

Moreover, Plaintiff actually prevailed at the first trial with an award of $190,000.00. Plaintiff succeeded again at the second trial, with an award of $1,975,713.00, where evidence of decedent's smoking habit was admitted. Plaintiff's attempt to attribute the lower award in the first trial to Dr. Kelly's mention of smoking is therefore purely speculative. Critically, a different jurist presided over the second trial with a different jury, and the judge

permitted defendants to introduce decedent's smoking habit in the second trial as it pertained to damages. The variable circumstances between the two trials means Plaintiff cannot reasonably use the difference between the two verdicts as a yardstick for sanctions. Likewise, the court erred in awarding Plaintiff any fees or costs based on Plaintiff's counsel's allegations of loss. *See Rhoades, supra*; *Gunther, supra*; *Hersperger, supra.*

Moreover, having already prepared for the first trial, Plaintiff's counsel cannot honestly say they incurred the same costs and fees in the second trial. Although the responsibility for setting counsel fees lies primarily with the trial court, we have the power to reverse that exercise when there is plain error. *See Gilmore, supra* at 1108 (stating: "Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award"). Significantly, this case was pursued on a contingency-fee arrangement, which intrinsically involves some risk that counsel will recover no money for the professional services rendered. *See id.* at 1110. In other words, by virtue of a contingency-fee arrangement, Plaintiff's counsel assumed the risk that they would not get paid at all as well as the risk that they would lose the money advanced for the costs of Plaintiff's suit. *Id.*

Similarly, the court's separate monetary award as a sanction in favor of Plaintiff personally in the amount of $170,235.16 for "actual expenses" cannot stand, where the award was completely arbitrary and without

reasonable explanation except to comment that it was "a very emotional case for Plaintiff's family." (*See* Trial Court Opinion, filed February 3, 2015, at 24.) The record provides no evidentiary support at all for this particular sanction. Therefore, we hold the sanctions the court imposed on Ms. Raynor were unjustified.

The prejudice allegedly suffered as a result of Dr. Kelly's errant comment during the first trial was rectified with the grant of a new trial. The difficulties inherent in the underlying medical malpractice case and the hourly fees associated with the high number of lawyers who allegedly touched the file were embellished without basis. Plaintiff's case carried no question of law or fact so novel as to support the extensive charges. Even if the case had involved new questions, counsel took the matter to court on a contingency-fee basis. Plaintiff's lawyers are self-reported experienced practitioners, who consequently had systems in place to deal with malpractice cases.

Yet, the contempt narrative took on a life of its own. Each time Plaintiff's counsel brought the contempt issue before the court, they presumed what they were initially required to prove and presented their conclusions with transparent venom, bloom, innuendo and increased outrage, refreshed periodically with personal attacks on Ms. Raynor. Counsel's crusade caused their proclaimed injustice to gather potency over time. The court's role in this regard was to engage in an even-handed

assessment of what had happened at the 2012 trial, without subsequent suggestion from counsel, particularly where the court was not inclined to grant a mistrial when the error actually occurred and was convinced its curative instruction would suffice. Only after the jury rendered its verdict in the first trial did the court second-guess itself, with the ardent assistance of Plaintiff's counsel. On this record, therefore, we are bound to conclude that the court erred in its assessment of contempt. Likewise, its sanctions were gratuitous and imposed in an amount that was both unprecedented and punitive. Accordingly, we reverse the order finding Ms. Raynor in contempt and vacate all judgment related to the sanctions imposed on her.

Order reversed; sanctions vacated.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/15/2016