J-A21040-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| L.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C.MCG. | : | No. 560 EDA 2018 |

Appeal from the Order Entered February 1, 2018
In the Court of Common Pleas of Bucks County Family Division at No(s):
2011-62920-C

BEFORE: PANELLA, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED NOVEMBER 26, 2018**

L.M. appeals from the order finding her in contempt of the July 31, 2017 custody order and remanding her to the Bucks County Correctional Facility for ten days, which could be purged "immediately thereafter" if she wrote a "letter in her own hand as to how she will abide by this Court's Order in the future," and ordering her to pay to C.M.'s counsel $12,256.75 in counsel fees within 10 days of her release. We affirm.

L.M. and C.McG. are the parents of twin children, L. and E. ("Children") (born April 2010). L.M. initiated this custody action in September 2011. On July 31, 2017, following a 14-day hearing, the trial court ordered that primary physical custody of Children would be with C.McG. during the school year and that L.M. would have custody every first and third weekend. This schedule would reverse in the summer.

C.McG. filed a Petition for Special Relief for Finding of Contempt and Counsel Fees ("Petition for Contempt"), alleging L.M. was in contempt of the custody order when she did not return the Children at 5:00 p.m. on Sunday following two of her custody weekends. L.M. filed an Answer and the trial court conducted a hearing, at which both C.McG. and L.M. testified.

C.McG. testified that on the weekend of October 22, 2017, L.M. returned Children home 30 minutes late because they went to dinner in Peddler's Village, which was ten minutes from C.McG.'s home. N.T., 2/1/18, at 10. She further testified that L.M. failed to return Children on Sunday, November 5, 2017, and that L.M. kept them Sunday night and drove them to school on Monday. *Id.* at 13-19.

L.M. did not deny that she was 30 minutes late on October 22, 2017, or that she kept Children on November 5, 2017. She claimed that on October 22, she and her mother took Children to get donuts at Earl's, a restaurant in Peddler's Village. *Id.* at 33-34. Further, on November 5, Children were very upset and L.M. felt she had to let them stay. *Id.* at 36-37.

In the Petition for Contempt, C.McG. stated her counsel's rate was $450.00 per hour. Petition for Contempt at ¶ 32. At the hearing, C.McG.'s counsel informed the court that she attended a custody conference, as well as the hearing on the emergency petition. N.T., 2/1/18, at 81-82. She provided to the court a fee certification and affidavit, which included an itemization of the fees. *Id.* at 81-83. The documents supporting the fee award are not part of the certified record. L.M. also filed a petition for contempt, which was

denied. L.M. sought a counsel fee award of $10,000.00. ***Id.*** at 79. L.M.'s counsel's fee certification also is not part of the certified record.

The trial court found that C.McG.'s counsel was "an attorney in good standing before" the court. ***Id.*** at 82-83. It found, based on counsel's affidavit and certification of legal fees, that the fees sought, $12,256.75, were "reasonable and necessary to prosecute this contempt action." ***Id.***

The trial court found L.M. in contempt. It stated:

> This litigation has continued for approximately seven years. There have been almost 200 filings back and forth between [L.M.] and [C.McG.]. The filings are created because a couple who was once very much in love and got along famously can no longer say that. This romance, this partnership, ended on very unhappy terms.
>
> . . .
>
> So I have sat through 14 hearings in this case. I have made all of these decisions. It's not a science. It's not an art. It's not a crap shoot either. I have to make a decision separate and apart from the troubles between [C.McG.] and [L.M.] as to what would be in the best interests of these two children. They're babies. They can't speak for themselves.
>
> . . .
>
> What have I heard today? Well, I read the Petition, of course. And having read it, I said to myself, there must be an explanation. How could an Order which is so clear and unmistakable be the subject of this type of violation? So, of course, as with all cases, this case especially, I read the report of the Custody Conference Officer. And it mirrors the facts that I've heard today.
>
> The other information section notes that [L.M.] withheld the children. I'm looking further in that Custody Conference Report, and there is, apparently, a quote from [L.M.] that said[,] "What else should a responsible parent do when

children are that upset," referring to this meltdown which you describe.

The answer to that is very simple, [L.M.]. You're the adult and they are the children. I don't believe they had a meltdown, but let's assume they did. Before that meltdown happened, before the temperature rises with [Children] you say to them as best you can explain to children their age, look, [C.McG.] and I have an agreement. I have to drop you off by 5 o'clock.

Now, I know you'd like to stay and have pizza and watch the football game, but [C.McG.] has dinner ready for you. I understand that and I'll see you soon enough. That's what, quote, a responsible parent would do.

. . .

Let's hear the testimony again to recapitulate what was said. On the weekend of October 22, 2017[, L.M.] returned the children at 5:30 p.m. Is that so egregious as to outrage this Court's sensibilities? No. We understand traffic, deadlines, commitments, other issues that come up. Children always aren't ready when we expect them to be.

So that extra half-an-hour is not a matter of great urgency, except we know that [L.M.] understands that 5 o'clock means 5 o'clock. And where was she? Was she so far away that the 5 o'clock timeline was not attainable? No, she was within ten minutes of [C.McG.'s] home, in Peddler's Village.

We take judicial notice that Peddler's Village is in close proximity to where the children should be returned. From [C.McG.'s] point of view, while she's angry that the timeline is not met, she could also, at least, in the first place say I wonder why [L.M.] is late. I hope the kids are okay. Maybe they were in a car accident. Maybe something happened.

The explanation is we wanted to go to Earl's, Peddler's Village, and they were there with their Nana. That's great before 5 o'clock or on your time, but it is unacceptable on the times that I have specified.

It is a blatant, clear, willful, intentional disregard of my Order. And please understand, [L.M.] that it's my Order and therefore, it's your Order. You have given me the authority

to make important decisions in your children's lives and I accept that duty, but when I do, the Order must be obeyed; otherwise, we have anarchy and chaos.

I'm never happy when I'm confronted with a Petition for Contempt. I somehow think that I failed or perhaps the system failed. The system hasn't failed. You failed. Is this an aberration, that October 17th event? No, because on the heels of that quickly we have the weekend of November 3rd, 2017 through November 5th, 2017. That is the weekend that was important to you. 5 o'clock is still the timeline.

There are texts back and forth. Texts which are responded to. Texts which are ignored. . . .

I don't believe this meltdown is true, but what I do believe is that you tell [C.McG.] the children will have dinner with you. [C.McG.] has already made plans and expects the Order to be followed and doesn't agree with that.

Is she being ridiculous? No, she has said we have an Order, and she has probed into my mind as to the reason for that Order, and she is correct. These are school kids. We want to make sure they get home in time to have dinner. Wherever that will be, and that it is not a late evening and that they get to school fed and refreshed and relaxed.

. . . At a time when the children should have been at the dinner table with [C.McG.], at 5:17 p.m., [L.M.] in no uncertain terms states the kids are staying here. And that's confirmed again by a voicemail which I heard in court. The kids are staying here. I'm not taking them to you.

You did not return the children until after school on Monday. I assume intellectually [C.McG.] realized that they would be returned to school, but she didn't know that until thereafter. The text messages are instructive. They just continued and continued.

One of the ones that I find to be very important is confirming what [C.McG.] said in her testimony, a blunt direct statement, quote, at 5:17 p.m., "The kids are staying here," end of quote. Why? Because she has decided. No, I have decided. You have allowed me to decide.

So when I think about it, and the personalities at play here, it is not the failing of me or it's not the failing of the court system. It's the failing of an otherwise responsible, reasonable, intelligent woman to appreciate if not the majesty of the court, but the importance of a Court Order.

I look for an explanation. I couldn't find it. The explanation which I conclude is appropriate is this. [L.M.] feels aggrieved by my Order. She came into court thinking she's the birth mother and, therefore, she gets a priority as to custody.

In many cases that happens. It didn't happen in this case because of the conduct of [L.M.] and [C.McG.] on some levels, but the decision is that the children would be best served if they stayed with [C.McG.].

We did not say that [L.M.] is not a capable parent. We gave her, as part of the Order, the first and third weekend of every month, from Friday at 5:00 p.m. to Sunday at 5:00 p.m. We also recognize that it's important for the children to be with both parents and said the physical custody order will reverse in the summer.

It's fair to the children. It's fair to the parents, and in my view, it makes perfect sense. We find as a fact, and the evidence is compelling and unmistakable that [L.M.] is in willful violation of this Court's Order. This was mean-spirited. It was done with a view and a mindset to contravene our Order.

. . .

There are no equities in this particular contempt matter. They are clearly on the side of [C.McG.]. They are clearly against [L.M.], who acted, again, willfully and with deliberation and with a mean spirit.

. . .

We find that [L.M.] is in willful contempt of this Court's Order previously entered. She is remanded and committed to the Bucks County Correctional Facility for a period of ten days. She will be taken into custody now. Within that time period she will send a letter to the Court in her own hand explaining to me how in the future she intends to abide by this Order.

Ten days after her release, whenever that occurs, she shall -- . . . pay in cash or certified check to . . . counsel for [C.McG.] the sum of $12,256.75.

Again, so it is clear, so there's no mistake, I want you to write to me in your own hand how you intend to abide by this Order in the future. She's remanded to the custody of the Sheriff. That's all.

N.T., 2/1/18, at 84-97. The trial court then issued an order finding L.M. in contempt and ordering that:

[L.M.] is remanded to the Bucks County Correctional Facility for a period of ten (10) days. Within that time she is to write a letter in her own hand as to how she will abide by this Court's Order in the future, and to be purged of contempt immediately thereafter.

Within ten (10) days of her release, [L.M.] shall pay to [C.McG.'s] counsel in cash or certified check, the amount of $12,256.775 in counsel fees.

Order, 2/1/18. L.M. filed a motion for reconsideration, which the trial court denied.

L.M. filed a timely notice of appeal. She raises the following issues on appeal:

1. Whether the trial court committed an abuse of discretion in holding the Appellant in contempt of [its] July 31, 2017 Order.

2. Whether the trial court impermissibly commingled civil and indirect criminal contempt resulting in [L.M.'s] punitive punishment in contravention of statutorily required procedural safeguards.

3. Whether the trial court erred in awarding attorney's fees where the evidence does not support a finding that the [L.M.'s] actions were vexatious, obdurate or in bad faith.

4. Whether the trial court erred in failing to consider the reasonableness of the attorney's fees awarded.

- 7 -

5. Whether an award of attorney's fees should be subject to a cogent standard to determine both the reasonableness of the fees awarded and contemnor's ability to pay.

L.M.'s Br. at 3.

Although in her first issue in her statement of questions L.M. states the trial court erred in finding her in contempt, she waived this claim by failing to include it in the argument section of her brief. ***In re W.H.***, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (finding claims waived where appellate brief does not contain discussion of claim with citation to relevant authority or development of claim in meaningful fashion). Further, even if she had not waived the claim, we would conclude it lacks merit. Here, the trial court properly found her in contempt because C.McG. proved, and the trial court found, that L.M. had notice of the custody order, that L.M.'s violation of the order was volitional, and that she acted with a wrongful intent. ***Coffman v. Kline***, 167 A.3d 772, 780 (Pa. Super. 2017) (quoting ***Sutch v. Roxborough Memorial Hosp.***, 142 A.3d 38, 67–68 (Pa. Super.), *appeal denied*,163 A.3d 399 (Pa. 2016)) (stating to support finding of contempt, petition must establish "(1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent").

L.M. next argues the trial court erred by commingling civil and indirect criminal contempt and by imposing incarceration. She maintains the dominant purpose of the trial court's order was to vindicate the court's authority and, therefore, the court held her in criminal, rather than civil, contempt. She

argues that the trial court imposed a criminal sanction in violation of her Due Process rights. She further contends that, although the order contained a purge condition, she was not granted an opportunity to purge the imprisonment prior to her incarceration.

The Divorce Code governs contempt for non-compliance with custody orders and provides:

> (1) A party who willfully fails to comply with any custody order may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:
>
>> (i) Imprisonment for a period of not more than six months.
>>
>> (ii) A fine of not more than $500.
>>
>> (iii) Probation for a period of not more than six months.
>>
>> (iv) An order for nonrenewal, suspension or denial of operating privilege under section 4355 (relating to denial or suspension of licenses).
>>
>> (v) Counsel fees and costs.
>
> (2) An order committing an individual to jail under this section shall specify the condition which, when fulfilled, will result in the release of that individual.

23 Pa.C.S.A. § 5323(g).

The difference between civil contempt and criminal contempt is "a distinction between two permissible responses to contumacious behavior." *Garr v. Peters*, 773 A.2d 183, 190-91 (Pa.Super. 2001) (quoting *Diamond v. Diamond,* 715 A.2d 1190, 1194 (Pa.Super. 1998)). The responses are "classified according to the dominant purpose of the court." *Id.* at 190. "If the

dominant purpose is to prospectively coerce the contemnor to comply with an order of the court, the adjudication is civil." ***Id.*** In contrast, if "the dominant purpose is to punish the contemnor for disobedience of the court's order or some other contemptuous act, the adjudication of contempt is criminal." ***Id.*** Further, the "[d]ominant purpose of coercion or punishment is expressed in the sanction imposed." ***Id.*** Where the contempt is civil, it "coerces with a conditional or indeterminate sentence of which the contemnor may relieve himself by obeying the court's order." ***Id.*** at 191. A criminal contempt "punishes with a certain time of imprisonment or a fine which the contemnor is powerless to escape by compliance." ***Id.*** (quoting ***Diamond***, 715 A.2d at 1194). "[T]hose accused of indirect criminal contempt are provided the safeguards which statute and criminal procedures afford." ***Crozer-Chester Med. Ctr. v. Moran***, 560 A.2d 133, 137 (Pa. 1989).

Here, the trial court stated it found L.M. in civil contempt. Trial Court Opinion, filed Mar. 16, 2018, at 4, 8-9. Further, the order contained a purge condition and the court entered the order to coerce future compliance, to the benefit of C.McG. Although L.M. did not have an opportunity to purge herself of the contempt prior to her incarceration, the statute merely requires a purge condition. It does not require that the person found in contempt be permitted to purge himself or herself prior to imprisonment. 23 Pa.C.S.A. § 5323(g)(2); ***see also Sinaiko v. Sinaiko***, 664 A.2d 1005, 1008-10 (Pa.Super. 1995) (finding, where husband had ability to pay, trial court did not abuse discretion when finding husband in contempt and immediately remanding to Bucks

County prison, with a purge condition of payment of $39,936.00). Cases have suggested in dicta that a party must be provided an opportunity to purge *before* imposition of punishment. ***See, e.g., Flannery v. Iberti***, 763 A.2d 927, 929 (Pa.Super. 2000) (citing ***Diamond***, 715 A.2d at 1994) (stating that contempt is civil in nature, rather than criminal, if contemnor is given opportunity to purge himself before imposition of punishment); ***Sinaiko***, 664 A.2d at 1009 (quoting ***Colbert v. Gunning***, 533 A.2d 471, 472 (Pa.Super. 1987) (stating that if contemnor is given opportunity to purge himself before imposition of punishment, contempt order is civil in nature). The cases do not hold that a person found to be in contempt cannot be placed in custody immediately, and released after completion of a purge conduct. ***See, e.g., Flannery***, 763 A.2d at 929 (holding court did not err in not holding party in contempt); ***Sinaiko***, 664 A.2d at 65 (finding court did not abuse discretion when finding husband in contempt, ordered husband remanded to custody, and found husband had present ability to pay purge amount).

We further note that the trial court had numerous interactions with the parties, having presided over a 14-day hearing to determine custody. Based on this record, we find the trial court did not abuse its discretion when it found L.M. to be in civil contempt and when it order imprisonment for 10 days, with an opportunity to immediately purge the contempt by writing a letter specifying how she intended to comply with the custody order.

L.M.'s next three issues address the requirement that she pay $12,256.75 in counsel fees. L.M. first maintains the trial court determined the

fees without considering whether the amount was reasonable and without providing an opportunity for her to challenge the reasonableness of the fees.

Counsel fees are a proper sanction for contempt for noncompliance with a custody order. 23 Pa.C.S.A. § 5323(g)(1)(v). We review an award of counsel fees for an abuse of discretion. **Wood v. Geisenhemer–Shaulis**, 827 A.2d 1204, 1208 (Pa.Super. 2003).

In the contempt petition, C.McG. stated that counsel's rate was $450.00 per hour.[1] At the hearing, the C.McG.'s counsel provided the trial court with a fee certification for $12,256.75, and noted that she had been required to attend a Custody Conference and the hearing due to the contempt. N.T., 2/1/18, at 81-82. The trial court reviewed the fee certificate and found the fees sought reasonable and necessary to prosecute the contempt petition. **Id.** at 82-83; Trial Ct. Op. at 10. The trial court did not provide a lengthy discussion as to why the sought amount was reasonable, but did review the certification and affidavit and concluded that the fees sought were reasonable and necessary. Although $12,256.75 may be considered a high fee award, we cannot find that this was an abuse of discretion, particularly where the court reviewed the presented documentation, L.M. did not object to the certification and affidavit, and L.M. sought $10,000 in counsel fees for prosecution of her contempt petition against C.McG.

---

[1] There is no allegation that this was not a reasonable hourly fee.

L.M. next maintains the record does not support a conclusion that her actions were vexatious, obdurate, or in bad faith. L.M. did not raise this issue in her Statement of Errors Complained of on Appeal, and, therefore, waived it. Pa.R.A.P. 1925(b)(vii) (issues not included in statement are waived). Further, as noted above, an award of counsel fees is a proper sanction for a finding of contempt in custody actions. 23 Pa.C.S.A. § 5323(g)(1)(v). The court did not need to find L.M.'s actions were vexatious, obdurate, or in bad faith to award such fees.

In her last issue, L.M. contends the court erred in failing to consider her ability to pay the counsel fees prior to ordering the sanction.

We have held that a trial court does not abuse its discretion if it imposes counsel fees as a sanction for failure to comply with a custody order without determining whether the party has the ability to pay the fee award. **Hopkins v. Byes**, 954 A.2d 654, 659 (Pa.Super. 2008). L.M. asks us to require an assessment of ability to pay, or require that the party be provided an opportunity to establish they lack the ability to pay, where the fee award is more substantial than the $500.00 at issue in **Hopkins**. On its face, the statute does not require a prior finding of ability to pay, and we decline to engraft a new provision onto clear statutory text.

Order affirmed.

- 13 -

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 11/26/2018*